448 F.2d 483
 Mildred A. PATCH, Administratrix of the Estate of Parker P. Patch, Plaintiff-Appellee and Cross-Appellant,
v.
The STANLEY WORKS (STANLEY CHEMICAL COMPANY DIVISION) and Thomas Keller, Defendants-Appellants and Cross-Appellees.
Joseph A. SOUCY, Plaintiff-Appellee,
v.
Thomas KELLER and The Stanley Works, Defendants-Appellants.
 No. 663.
 No. 664.
 No. 681.
 Docket 34943.
 Docket 34947.
 Docket 34961.
 United States Court of Appeals, Second Circuit.
 Argued February 10, 1971.
 Decided August 17, 1971.
 
 COPYRIGHT MATERIAL OMITTED Herbert Watstein, Watstein & Watstein, Bristol, Conn., for plaintiff-appellee and cross-appellant.
 William R. Davis, Leon RisCassi, RisCassi, Davis & Linnon, Hartford, Conn., for plaintiff-appellee Soucy.
 Philip S. Walker, Charles W. Page, John B. Nolan, Day, Berry & Howard, Hartford, Conn., for defendants-appellants and cross-appellees.
 Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and McLEAN, District Judge.*
 WATERMAN, Circuit Judge:
 
 
 1
 Defendants-appellants Stanley Works (Stanley Chemical Company Division) and Thomas Keller were sued by the Administratrix of the Estate of Parker P. Patch for having wrongfully caused the death of Patch, and by Joseph A. Soucy for having caused Soucy to be injured. From judgments on jury verdicts in favor of each of the plaintiffs the defendants appeal. A jury verdict in the Patch action was returned for $97,000, which amount upon defendants' motion was reduced to $40,000 by the order of the trial judge, and plaintiff-administratrix cross-appeals from that order. Further, defendants-appellants appeal from an order of the trial judge allowing interest on each of the awards from the date the complaints were filed. Further details concerning the appeals are set forth more specifically later in this opinion after exposition of the facts and during discussion of the several issues the parties have raised.
 
 
 2
 The Stanley Chemical Company, a division of the defendant-appellant Stanley Works,[1] produces specially-formulated product finishers tailored to meet the particular vagaries of a given plant's production equipment. The evidence at the trial below, taken in the light most favorable to the plaintiffs, indicated that in 1964 Stanley Works acquired a small Massachusetts corporation engaged in the chemical coating business. In 1960, prior to its acquisition by Stanley, this company had sought to develop a process by which a Hypalon finish could be applied to polyurethane foam by employing a wallpaper coating machine, and to this end it had contacted the Dalbolt Company, a New Hampshire textile printer. However, no subsequent action was taken to further this project until early in 1964, after the acquisition by Stanley Works.
 
 
 3
 In April of that year Dalbolt requested Stanley to develop a suitable dye or coating compound for use by Dalbolt to print polyurethane foam. Dalbolt's production line, like so many others in the trade, was then, and is now, unique; it employs a three-stage procedure. In the first stage a rotary printing press is involved, which prints or coats the material, generally a fabric, with a color. Then related equipment conveys the coated colored material into and through a drying oven composed of two stages — the "preheat" section, designed to evaporate any solvent remaining on (rather than in) the material, and the "fusing" section, designed to fuse the coating to the fabric. Once the material passes through the oven, it normally will be dry and can be rolled immediately.[2]
 
 
 4
 Stanley, pursuant to Dalbolt's request, dispatched an employee, defendant-appellant Keller, a "technical representative," to Dalbolt's Keene, New Hampshire, plant. On his first visit, he examined Dalbolt's production line and completed a detailed report describing the process, and, significantly, he recorded the temperature ranges and capacities of the two oven stages. This report was used by Stanley's chemists to develop a coating compound which would function in this unique equipment. Three test runs were held. The first, in May, indicated that large quantities of coating material would be required, as the foam displayed a characteristically high absorptive quality. A second test, using a different ingredient in the compound, was run on June 10 on a small quantity of foam. A third run, interrupted by the explosion here involved, occurred on June 30, 1964, and was to have tested the adaptability of a much larger quantity of material.
 
 
 5
 For this June 30 test, Stanley sent from its Connecticut laboratory two substances (thirty gallons of one and twenty-five of another) to be combined in New Hampshire to create the coating compound. Under Keller's supervision, these liquids were mixed by a Dalbolt employee and inserted into the troughs of the printing press. In fact, 52 per cent by weight of this compound contained the ingredient Solvesso-100, a potentially highly flammable substance. Dalbolt did not know that this substance was to be used. No literature from Stanley accompanied the cans and the invoices were silent as to their contents. Plaintiff's decedent Patch, Dalbolt's plant superintendent, knew that Solvesso-100 had been used in the earlier June experiment, but he did not know that it would be also used in this test.[3] In the past, Dalbolt had used Solvesso on other jobs and knew its flashpoint, i. e., the temperature at which ignition would cause explosion, and so Dalbolt had used it within carefully defined temperature ranges.[4] When the liquids had been inserted Keller ordered the oven set at particular ranges and gave instructions as to the length of time the coating process should take. Plaintiff Soucy, a Dalbolt printer and machine operator, was called to the plant immediately prior to the test to make minor modifications in the press machinery, especially to the rollers and sieve cloth, so as to insure that the foam would be completely covered by the compound as it passed through the oven. After making the necessary adjustments he was ordered to start the machine and did so.
 
 
 6
 Being a highly absorptive material, the foam retained much of the coating compound in liquid form when it passed from the preheat stage where it had not been exposed to an open flame into the fusing stage of the drying oven where there was an open flame and where the temperature was approximately 285° F. This combination of a volatile substance and a high degree of heat was sufficient to push the Solvesso ingredient past its flashpoint, and when the substance contacted the flame an explosion inevitably occurred.[5]
 
 
 7
 Plaintiff Soucy suffered serious burns over 97 per cent of his body. Plaintiff's decedent, Dalbolt's plant supervisor Patch, suffered even more serious burns, and died shortly thereafter.
 
 
 8
 Predicating jurisdiction on the diverse citizenship of the parties, the New Hampshire administratrix of the Patch estate commenced a wrongful death action in May, 1965, against the Stanley Works and Keller[6] in the U. S. District Court for the District of Connecticut. Soucy's action was brought in a Connecticut state court and was removed on Stanley's motion to the U. S. District Court. The two cases were consolidated for trial by order of Judge Clarie, and were tried before Judge Blumenfeld and a jury.
 
 
 9
 The jury returned plaintiffs' verdicts against both defendants, $97,000 for the Administratrix of the Patch Estate and $70,000 for Soucy. A defense motion to reduce the Patch verdict to $40,000 was granted, and the court awarded interest on the $70,000 and $40,000 judgments from the dates the complaints were filed. Issues raised by the defendants' appeals and the Patch cross-appeal are discussed in context hereafter.
 
 I.
 
 10
 We must first determine what consideration, if any, a Connecticut court would accord New Hampshire law if adjudicating these cases, having in mind that the plaintiffs here are New Hampshire citizens and that the explosion occurred in New Hampshire. Sitting in its diversity jurisdiction, the U. S. District Court was bound by a long line of U. S. Supreme Court and federal court decisions mandating that it apply the substantive law of the forum state, Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), including its choice-of-law rules, Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); and, in so doing, the court determined that here a Connecticut state court would look to the substantive law of liability of New Hampshire. This threshold determination is not seriously challenged here.[7] Thus, looking to New Hampshire substantive law, the court instructed the jury that plaintiffs could recover only on a theory of strict liability, and defined that theory with reference to Section 402A of the American Law Institute's Restatement of Torts, Second (1966).[8] Defendants mount three attacks upon this determination: first, that the doctrine of strict liability has no application to the facts here; second, that plaintiffs failed to sustain their burden of proof; and third, that even if the theory of strict liability is legally relevant to the facts, the court's instructions were in error.[9]
 
 
 11
 We are confronted at the outset with the relative dearth of New Hampshire law on the subject of strict liability. In Elliott v. LaChance, 109 N.H. 481, 256 A.2d 153 (1969), the New Hampshire Supreme Court cited the Restatement's analysis with approval, and then, exactly six months later, recognized Section 402A to be the law of the state, Buttrick v. Lessard & Sons, Inc., 110 N.H. 36, 260 A.2d 111 (1969).[10] Neither case raised the complex issues raised here. In Elliott, the court ruled that plaintiff had failed to prove the existence of a defect in the products used by defendant which, had the defect existed, would have caused the injuries complained of. In Buttrick, plaintiff was nonsuited at the conclusion of his opening statement. He had purchased a new automobile whose headlights persisted in failing during nighttime driving. Each time this happened he would return it to his authorized repair service, all to no avail, even though new equipment was added and the car's parts were examined. One evening the lights failed while plaintiff was driving and an accident followed. Suit was brought against the defendant garage. The New Hampshire Supreme Court, quoting from Section 402A, reversed. It held that plaintiff could recover under a strict liability theory "if there is evidence from which a jury could find that the malfunction of the lights caused the accident and arose from a defect present at the time of purchase," 260 A.2d at 113. While instructive, neither decision provides us much help here. Further, our search of New Hampshire law in related areas has profited us little. Nevertheless, even though a state's relevant law is unclear or difficult to ascertain, it is still our duty to render a decision by attempting to apprehend the result that that state's courts would reach, see Bernhardt v. Polygraphic Co. of America, Inc., 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956), and where the relevant law is interstitial, we may look for guidance "to such sources as the Restatements of Law, treatises and law review commentaries, and the `majority rule,'" Wright, Federal Courts § 58, at 206 (1963); cf. Delaney v. Towmotor Corp., 339 F.2d 4 (2 Cir. 1964). Happily for us, the New Hampshire Supreme Court cited the Restatement as controlling in both Elliott v. LaChance and in Buttrick, and so, in our search for guidance, we use the Restatement as our point of departure. See also Frumer & Friedman, Products Liability (1968); Kessler, Products Liability, 76 Yale L.J. 887 (1967).
 
 
 12
 Defendants first claim that the plaintiffs are not within the class which Section 402A seeks to protect, and, also, that the product[11] is not of the type against which protection is sought.[12] We think that the New Hampshire courts would disagree with defendants. The Reporter's Comments to Section 402A make clear that an employee of an "ultimate consumer or user" is just as entitled to be protected as is his employer. Dalbolt being the ultimate consumer of the liquid coating compound before its properties were changed, both plaintiffs are included within the protected class. See comment 1 to Section 402A. Furthermore, most jurisdictions confronted with this issue have ruled that employees such as Patch and Soucy are to be protected, see, e. g., the cases cited in ALI (1966) Restatement of the Law, Second, Torts, Appendix, Vol. 3, §§ 402A to 503, Comment h at 7-8.
 
 
 13
 The Reporter's Comments also make clear that defendants' additional claim that the product was not of the type includable within the protection provided by Section 402A because it was to undergo further processing or substantial change, misinterprets the policy underlying Section 402A. In such circumstances, the test to be employed "is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes." Comment p to Section 402A. Because of the degree of control exercised by defendants over the test, there is, of course, a most serious question as to whether there was, or could have been, "an intermediate party" who could have made the discoveries and could have taken precautions. The defendants conducted the test; the Dalbolt employees followed Keller's orders, and they had no knowledge of the ingredients of the coating compound. But even if Dalbolt can be considered to have been an "intermediate party," the duty to protect others remained on the defendants. While we recognize the cogency of defendants' claim that liability might be better allocated with reference to the parties' ability to prevent the dangerous condition, the facts here do not permit the shifting of liability from defendants. Indeed, the situation here is strikingly similar to the examples given by the Reporter in Comment p, cited supra, which hold that the seller has a duty to give adequate warning.
 
 
 14
 The defendants' liability is succinctly stated: "Where, however, [the seller] has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger * * * and a product sold without such a warning is in a defective condition." Comment h to Section 402A.[13] Plaintiffs' evidence raised this issue, and from this evidence the jury could well have found that defendants knew that the coating compound was to be cemented to the foam by use of Dalbolt's equipment, that they knew the oven's capacities and capabilities, and that they knew that Solvesso-100, raised above its flashpoint, would explode when ignited. And, most crucially, it is not disputed that they failed to warn Dalbolt, its employees, or its agents, of this risk. This is not the situation that arises when a product becomes defective because it is misused; here the product had been specially created for the use to which it was put and was actually being used for the very purpose for which it was intended. Nor is it likely that Dalbolt was under any duty to foresee the possibility that Solvesso-100 would be employed by defendants, for the coating compound had been formulated by defendants with knowledge of the oven's capacities and capabilities and with the knowledge of the properties of Solvesso-100.[14]
 
 
 15
 Lastly, defendants' brief lists, in almost fifteen pages of print, defendants' requests to charge which were denied, compared with the actual wording of the jury instructions as given. We have reviewed this material, as well as reviewing the entire charge, and we perceive no error in the charge as given. The issues the jurors were to decide were carefully stated and repeated. As we read defendants' complaints they are directed only to the court's choice of words and of emphasis, not to subject content, and we find no reason to hold these instructions to have been erroneous.[15] See Fed.R.Civ.P. 61.
 
 II.
 
 16
 The internal law of Connecticut does not purport to limit the amount which an executor or administrator may recover in a wrongful death action. Conn.Gen.Stat. § 52-555. New Hampshire's internal law, on the other hand, limits recovery in wrongful death suits to $40,000 where, as in the instant case, the decedent is survived by a spouse and minor children. N.H.Rev.Stat.Ann. § 556:13. When defendants moved to reduce the jury verdict of $97,000 in favor of the Patch estate, the district court ruled that New Hampshire law governed the amount recoverable and entered judgment against the defendants, in that action, in the reduced amount of $40,000, plus interest from the date of the complaint. Inasmuch as the district court was bound to follow the Connecticut rules pertaining to choice of law, Klaxon Co. v. Stentor, supra, the question before us is whether a Connecticut state court would have acted similarly. Plaintiff Patch presents numerous arguments why resort should not have been had to the New Hampshire limitation. We find none of these arguments persuasive and reluctantly affirm the judgment in this particular.
 
 
 17
 The Connecticut courts have rejected the argument that a limitation on the recovery of damages is "merely procedural" and therefore that a foreign statute or rule purporting to make such a limitation need not be followed by a forum state. Connecticut holds that "The creation and extent of liability in tort are fixed by the law of the state in which the tort is committed," Bissonnette v. Bissonnette, 145 Conn. 733, 734, 142 A.2d 527, 528 (1958) (emphasis supplied). For choice of law purposes under Connecticut law, a tort is committed not where the wrongful act or omission occurs, but where the injury is sustained. Commonwealth Fuel Co. v. McNeil, 103 Conn. 390, 130 A. 794 (1925); Bissonnette v. Bissonnette, supra; Landers v. Landers, 153 Conn. 303, 216 A.2d 183 (1966); Teitelman v. Bloomstein, 155 Conn. 653, 236 A.2d 900 (1967).[16] Indeed, even were Connecticut to reject this rule in favor of a "substantial contacts" analysis on this particular issue, see, e. g., Babcock v. Jackson, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), we reason, as did the district court, that a Connecticut court would still look to New Hampshire law with reference to the permissible limits of recovery, because, as the district court noted, all the substantial contacts — save only the defendant corporation's factory and offices — are found in New Hampshire.[17] Cf. Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961); Pearson v. Northeast Airlines, Inc., 309 F.2d 553, 557 (2 Cir. 1962), cert. denied, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963); Gore v. Northeast Airlines, Inc., 373 F.2d 717 (2 Cir. 1963); Farber v. Smolack, 20 N.Y.2d 198, 282 N.Y.S.2d 248, 229 N. E.2d 36 (1967).
 
 
 18
 Patch's administratrix argues for a different result on the basis that the New Hampshire limitation contravenes Connecticut "public policy." But, apart from any other considerations, until now such dispositions have been carefully limited by the Connecticut courts to situations not here relevant. See, e. g., Ciampittiello v. Campitello, 134 Conn. 51, 54 A.2d 669 (1947); Adamsen v. Adamsen, 151 Conn. 172, 195 A.2d 418 (1963); Santoro v. Osman, 149 Conn. 9, 174 A.2d 800 (1961). Furthermore, although plaintiff correctly notes that Connecticut has abolished its own statutory ceiling on the extent of permissible recoveries in wrongful death actions, this fact alone neither evidences a committed public policy against any limitation qua limitation nor evidences a recognition that while some limitations might be proper, the one here involved is not.
 
 
 19
 Finally, plaintiff maintains that a Connecticut court would know that a New Hampshire court would not apply the $40,000 ceiling to this case. With this as a premise, plaintiff then asserts that a Connecticut court would defer to the "whole law" of New Hampshire, including the New Hampshire law on multistate conflicts. See Griswold, Renvoi Revisited, 51 Harv.L.Rev. 1165 (1938); von Mehren & Trautman, The Law of Multistate Problems, 509-512 (1965); Ehrenzweig, Conflict of Laws, § 116 (1962). In support of this claim plaintiff points to the discussion by Chief Justice Kenison in Clark v. Clark, 107 N.H. 351, 222 A.2d 205 (1966), a case in which the New Hampshire Supreme Court declined to limit recoverability in accord with the law of the state where the injury occurred. The holding, however, in Clark v. Clark was that the internal law of New Hampshire controlled the liability and the extent of recoverability when the person suffering the loss was a New Hampshire domiciliary. In that case a New Hampshire husband and wife were motoring through Vermont en route from a New Hampshire origin point to a New Hampshire destination when they were involved in a highway accident in Vermont. The husband was operating the car, and the wife was injured. Vermont, the place of injury, had a guest statute which would have barred the wife from obtaining a recovery from her husband; New Hampshire had no such limitation. The New Hampshire court, there dealing with its own domiciliaries, did not apply the rule that the law of the place of injury controlled liability or the extent of recovery. In rejecting this rule, the New Hampshire court stated that, when a court is required to consider the interests of more than one jurisdiction, "no more is called for * * * than that a court apply the law of no state which does not have substantial connections with the total facts and with the particular issue being litigated." 107 N.H. 351 at 354, 222 A.2d 205 at 208. Here, not only was the deceased a New Hampshire domiciliary, but the liability for the deceased's wrongful death arose from an explosion that occurred in New Hampshire. It is quite evident then, that, on the facts here and in view of the overwhelming contacts with New Hampshire here present, a New Hampshire court would not look beyond its own internal law if it were adjudicating in this case.
 
 
 20
 Just as clearly it follows that a Connecticut state court would consider itself bound to apply, as a New Hampshire court would apply, the New Hampshire limitation upon recoverability, for the Connecticut courts' choice-of-law rule is to apply the law of the state "* * * in which the tort is committed." Bissonnette v. Bissonnette, supra, and cases cited at 528, supra. Therefore, we believe that in the circumstances here the Connecticut state courts would find that the Renvoi doctrines would be totally inapplicable. See Restatement of Law, Second, Conflict of Laws, Section 8.
 
 III.
 
 21
 Whether a Connecticut court would refer to the Connecticut rule or the New Hampshire rule with reference to the granting of pre-judgment interest is the final issue raised by the parties. New Hampshire provides that interest on a damage award is to be granted "from the date of the writ or the filing of the petition to the date of [the] verdict * * * even though such interest brings the amount of the verdict * * * beyond the maximum liability imposed by law," N.H.Rev.Stat.Ann. § 524:1-b (1970 supp.), and it is not challenged that, if either of these actions had been brought in New Hampshire, pre-judgment interest from the dates of the writs would be ordered. See N.H. Judicial Council, 12th Report 46 (1968). Defendants argue that Connecticut would not grant such interest in a purely domestic suit. But see Southern New England Ice Co. v. West Hartford, 114 Conn. 496, 159 A. 470 (1932); Blake v. City of Waterbury, 105 Conn. 482, 136 A. 95 (1927). Stated more precisely, the question before us is whether a Connecticut court would consider the New Hampshire statute procedural on the one hand, or substantive on the other.
 
 
 22
 Connecticut has recently reaffirmed that, in choice of law situations, the law of the state where the injury occurs governs "such right[s] as the plaintiff may have," while matters relating to choice or method of remedy or of procedure are governed by the lex fori, Rich v. Dixon, 153 Conn. 52, 212 A.2d 417, 419 (1965). See also Chasse v. Albert, 147 Conn. 680, 166 A.2d 148 (1960); Thomas Iron Co. v. Ensign-Bickford Co., 131 Conn. 665, 42 A.2d 145 (1945). A Connecticut court will look to any "legal right of action which * * * [the plaintiff] may have, whether it arises under our law or that of another jurisdiction," except where enforcement of the foreign law would violate fundamental precepts embodied in the state's laws or traditions. Reilly v. Antonio Pepe Co., 108 Conn. 436, 143 A. 568, 572 (1928). However, in the Thomas Iron case, supra, an exception was grafted upon this general rule. There, it was stated that Connecticut will apply a foreign statutory remedy "where the `foreign remedy is so inseparable from the cause of action that it must be enforced to preserve the integrity and character of the cause and when such remedy is practically available,' Precourt v. Driscoll, 85 N.H. 280, 283, 157 A. 525, 527 [(1931)]," 131 Conn. 665, at 669, 42 A.2d 145, at 146.
 
 
 23
 It seems readily apparent that § 524:1-b would be considered substantive by a Connecticut court, even though it is found in a chapter of the New Hampshire Revised Statutes labeled "procedural." A rule of the state whose law governs liability that lost future earnings must be discounted to present value would surely be applied by the forum state regardless of any contrary rule of its own and even though the state whose law controls liability has provided, in a procedural code, that the jury should determine such earnings without discount and that this arithmetical process should be performed by the judge or by a clerk. New Hampshire's statute allowing prejudgment interest on damages which have accrued (including discounted future earnings) is simply the converse of a rule requiring the discount of damages not yet realized. Further, it is inconsequential that New Hampshire has included recovery of prejudgment interest in a portion of its compiled statutes which relates to procedure; its location simply reflects the fact that the computation of interest is a mechanical function usually performed by the clerk, see § 524:1-c.
 
 
 24
 Moreover, the underlying policy of the New Hampshire statute is fundamentally one of substance. Receiving $40,000 or $70,000 in 1970 is not at all the same "substance" as receiving these amounts in 1965 and having the use of the money in the interim. In Pepin v. Beaulieu, 102 N.H. 84, 151 A.2d 230 (1959), the New Hampshire court held that the statute could be given even retrospective effect because "injustice results if interest, even in the case of unliquidated damages, cannot be allowed from the date of the injury." Id. at 89, 151 A.2d at 235.
 
 
 25
 However, in Chagnon v. Union-Leader Corp., 104 N.H. 472, 190 A.2d 721 (1963), a libel action, the vitality of Pepin's rationale was eroded, if not implicitly discarded. There the question was whether Section 524:1-b authorized interest from the date of the filing of the complaint. The court ruled that it did not, relying heavily on the statute's legislative history, which indicated that the legislative intent was to "expedite settlement" in automobile litigation, 190 A.2d at 724. While such a policy may not only assist New Hampshire courts to control their dockets, but, if applied in Connecticut, may also assist Connecticut courts to control theirs, this explanation would apparently cause Connecticut to classify the rule as procedural and hence to refuse its application to litigation in Connecticut courts. However, in our view, the exception in Thomas Iron compels the conclusion that a Connecticut court would follow the rationale of Thomas Iron especially because of the clause in Section 524:1-b stating that interest is to be computed from the date of filing even though when it is added to the jury verdict the total amount of verdict plus interest exceeds the maximum liability permitted.
 
 
 26
 In short, it is our belief that because New Hampshire recognizes that recoverable amounts obtainable under this procedural rule may be additional to the top limit of the amount permissible substantively, the Connecticut courts would allow interest from the date of the commencement of the action, even though that allowance increases the gross recovery to a figure in excess of $40,000.[18] It thus follows that the district court correctly directed the clerk to compute interest on the respective awards from the date the complaints were filed in each case.
 
 
 27
 The judgments are affirmed.
 
 
 
 Notes:
 
 
 *
 Of the Southern District of New York, sitting by designation
 
 
 [1]
 The Stanley Works is a Connecticut corporation and the Chemical Company maintains a place of business there
 
 
 [2]
 In each section there is a horizontal burner. Initially, air is drawn through a duct from outside the oven and is then passed over a flame. The heated air then passes into the preheat stage where it performs the function of evaporating the excess coating liquid. This air is finally drawn from the oven by means of an exhaust fan. In the fusing section the air passes over the burner to be heated, but, unlike the preheat stage, it is recirculated past the flame and so, in this recirculated state, it may contain some of the solvent
 
 
 [3]
 This determination is crucial and is supported by the record. Our reading of the transcript, especially Keller's testimony, indicates that Keller told Patch during the June 10 test that the coating compound contained Solvesso-100. Patch also knew, however, that Solvesso-100 had not been used in May, at the first run. There is nothing in the record that suggests that Dalbolt knew or should have known that Solvesso-100 was to be used in the June 30 test or that, if used, its proportion would be so high. Whether Patch was negligent is discussed below at fn. 15
 
 
 [4]
 Defendants in their brief claim that the court erred in refusing to admit into evidence as an exhibit some extracts from a volume concerning the proper operation of a drying oven because the witness who was to qualify the volume as authoritative in the field of science hedged in making a full qualification. The Conneccut law is clear that a properly qualified authoritative publication is admissible in evidence, either to impeach or to support the opinions expressed by an expert witness, or to be read from during summation. Kaplan v. Mashkin Freight Lines, Inc., 146 Conn. 327, 150 A.2d 602 (1959). Here there was no error in excluding the offered extracts because the treatise was not properly qualified
 
 
 [5]
 There was no explosion in the oven's first stage because there was no exposed flame
 
 
 [6]
 Keller was a resident of Massachusetts at the time the action was commenced
 
 
 [7]
 It is clear that under Connecticut law the issue as to whether liability for an injury was created and the issue as to the extent of a liability are to be governed by the law of the place of injury. Teitelman v. Bloomstein, 155 Conn. 653, 236 A.2d 900 (1967); State of Md. ex rel. Thompson v. Eis Automotive Corp., 145 F.Supp. 444 (D.Conn.1956)
 
 
 [8]
 § 402A reads:
 § 402A. Special liability of Seller of Product for Physical Harm to User or Consumer
 (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
 (a) the seller is engaged in the business of selling such a product, and
 (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
 (2) The rule stated in Subsection (1) applies although
 (a) the seller has exercised all possible care in the preparation and sale of his product, and
 (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
 
 
 [9]
 Preliminarily the defendants contend that the pleadings failed to raise the issue of strict liability, and they challenge the propriety of the court's charge on that issue. This contention is misleading. Even the pretrial order commented that plaintiffs, although not explicitly alleging strict liability as a separate theory, claimed that defendants' "materials were inherently dangerous," that they "contained no warning of being an inherently dangerous substance," and that "no warnings were given with respect to the dangers involved." Surely these allegations raised the issue of strict liability. In this posture it is the Federal Rules as opposed to the Connecticut Rules that are determinative as to the scope of issues covered by the pleadings and the use made of the pretrial order by the judge during the conduct of the trial. Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed. 2d 8 (1965). The court's action in so charging the jury was discretionary under Fed.R.Civ.P. 15(b). Inasmuch as defendants at oral argument were unable to inform this court what more they would have done had they been warned in advance that the district court would so charge, their claims of surprise and resultant harm are frivolous. See Baird v. Dassau, 1 F.R.D. 275 (SDNY 1940). Under these circumstances the exercise of the court's discretion was proper. See Fed.R.Civ.P. 8(f); 3 Moore, Federal Practice ¶ 15.13
 
 
 [10]
 See also Murray v. Bullard Co., 110 N. H. 220, 265 A.2d 309 (1970); Stephan v. Sears, Roebuck & Co., 110 N.H. 248, 266 A.2d 855 (1970); Kelley v. Volkswagenwerk Aktiengesellschaft, 110 N.H. 369, 268 A.2d 837 (1970)
 
 
 [11]
 Whether Solvesso-100 is a product, or an ingredient of a product, has not been argued by the parties. In either event, the Restatement explicitly refers to both, and we use the words interchangeably
 
 
 [12]
 These claims were first raised upon appeal, neither having been specifically raised below. However, the defendants took exception to the court's charge on strict liabilityin toto, and so we choose to discuss these lately raised arguments.
 
 
 [13]
 Cf. Butler v. L. Sonneborn Sons, Inc., 296 F.2d 623, 625-626 (2 Cir. 1961): "[A] manufacturer of an ordinarily safe article is not held to that degree of clairvoyance which hindsight alone can give. But, especially when injury is likely to be serious if trouble occurs, even slight foreseeability may warrant, and a long history of good fortune will not necessarily exclude a conclusion by the trier of the facts that prudence requires the manufacturer to take on so small an added burden" to afford "appropriate warnings that care in handling the product was needed, both to prevent it from becoming dangerous and to protect if it had."
 
 
 [14]
 Comment j to Section 402A excuses a seller for failure to warn where the product, or ingredients in it, are "dangerous or potentially so, when consumed in excessive quantity. * * *" At 353. Inasmuch as the amount was prescribed by the defendants, there was no excuse for a failure to warn
 
 
 [15]
 Defendants also claim that the court improperly failed to charge the jury on the question of the contributory negligence of both Patch and Soucy. We disagree. Such a defense was recognized in Buttrick v. Lessard, 110 N.H. 36, 38-42, 260 A.2d 111, 113-114 (1969), and although the New Hampshire court stated a dislike for phrasing the defense in terms of assumption of risk, it did indicate that in the strict liability field, as well as in tort situations generally, the defenses could be analogous. Irrespective, therefore, of how the defense is characterized, the substance of the court's charge relative to the plaintiffs' duties was correct. The Restatement notes that recovery should be barred where the plaintiff has discovered the defect, was aware of the danger, and nonetheless proceeded to use the product although a reasonable person would not have used it. The court instructed the jury that recovery would be barred on a finding that "the plaintiff assumed the risk of injury by voluntarily and unreasonably proceeding to encounter a known danger," that is, if plaintiffs "knew of the danger of an explosion by using this coating material * * * when they did use it, and, nevertheless, went ahead and proceeded unreasonably to use the product, in the face of that danger. * * *"
 The court's refusal to give a defendants' proposed instruction with reference to expert witnesses was proper in light of the charge which was actually given. The proposed charge would not have added or altered anything.
 
 
 [16]
 In Reilly v. Antonio Pepe Co., 108 Conn. 436, 143 A. 568 (1928), the converse arose. There a suit was brought in Connecticut for damages arising from a wrongful death occurring in New York. Connecticut law at the time would have limited the recovery; New York had no such ceiling. It was ruled that, inasmuch as the cause of action was governed by New York law, so also was the extent of recoverable damages, and the Connecticut ceiling would not be applied
 
 
 [17]
 As stated by Judge Blumenfeld in his memorandum opinion filed when ruling on the motion to reduce the Patch verdict: "In addition to the fact that the injury and death occurred in New Hampshire where the defendant's product was being used, the state most closely concerned with the disposition of the property of the estate of Parker Patch is New Hampshire, where the was domiciled. More importantly, New Hampshire, where his surviving widow and children live, is more significantly concerned with the possibility of their becoming a burden on the state than is Connecticut."
 
 
 [18]
 This conclusion would also be reached under a consistent line of decisions in the courts of New York and in this court applying New York conflicts law, which hold that the allowance of pre-judgment interest is controlled by the rule of the jurisdiction whose law determines liability, whether this works for or against a New York plaintiff. See cases cited in Ehrenzweig, Conflict of Laws 557 n. 42 (New York decisions) and n. 43 (decisions of some other states) (1962), and ALI Restatement of Conflict of Laws 2d, § 145 and § 171, comment c, and cases cited in Reporter's Note to comment c at p. 513 (1971). Professor Ehrenzweig's anticipation that, as a result of Kilberg v. Northeast Airlines, Inc., 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961), the New York courts might depart from their long-standing rule and "return to the basic law of the forum or give preference to the common law denial of pre-judgment interest by applying either forum or foreign law to this effect," was left unrealized in Davenport v. Webb, 11 N.Y. 2d 392, 230 N.Y.S.2d 17, 183 N.E.2d 902 (1962); accord, St. Clair v. Eastern Air Lines, Inc., 302 F.2d 477, 480-481 (2 Cir. 1962). However, inasmuch as the Connecticut courts have not indicated any inclination to adopt this New York approach to conflict of laws, we do not rely on the rationale of the New York cases in reaching our decision