Merrimack,
No. 5761.

DORIS ELLIOTT

*v.*

MARGUERITE LACHANCE.

Argued October 1, 1968.
Decided July 30, 1969.

*Eugene S. Daniell, Jr.* (by brief and orally), for the plaintiff.

*Sheehan, Phinney, Bass & Green* and *Joseph F. Devan* (*Mr. Devan* orally), for the defendant.

LAMPRON, J.  Action to recover damages, consisting of tempo-rary loss of hair, severe emotional disturbance and related expenses, following a shampoo and permanent wave administered to the plaintiff by the defendant at her beauty parlor in Franklin on September 12, 1964. The bases of plaintiff's action are (1) that the defendant negligently and carelessly performed the wave and other treatment, and (2) that the solution used in giving the permanent, warranted by the defendant to be safe, contained

in fact dangerous and harmful chemicals which made it unfit for use.

Trial by jury resulted in a verdict for the defendant on the negligence claim and in a verdict for the plaintiff in the amount of $1,500 on the warranty count. Defendant's exceptions to the denial of her motions for nonsuit, directed verdict, and for judgment notwithstanding the verdict on the warranty count were reserved and transferred by *Griffith*, J.

Plaintiff had been a patron of the defendant for 20 or 25 years. However, she had her hair bleached for the first time, in March 1963, while she was in Florida. Thereafter, not in defendant's beauty parlor, plaintiff's hair was rebleached a few times, a "toner" was also applied, and she received one or two permanent waves. Her first visit to defendant's establishment for a permanent wave after her hair had been bleached was on September 12, 1964 for the permanent in question.

Defendant testified that plaintiff had "baby-fine" hair which was very difficult to do and, when bleached, becomes even more sensitive to any form of treatment or solution. In giving a permanent wave a solution is used to process the hair which "is dangerous if you don't pick out the right solution for the certain type of hair. . . . Even if you have the right solution you have to be careful not to expose the hair to it over too long a period of time." A "test curl" is taken for the purpose of determining whether the hair is ready to be permanented and if properly given "you have complete assurance there will be no damage to the hair through the application of that solution." During the permanent other curl tests are taken "to determine how far the permanent has worked on the hair." Plaintiff testified that, although she asked defendant about a "test curl," none was taken at anytime, while defendant testified that she took the initial "test curl" and kept testing plaintiff's hair during the time the solution was on her hair.

Plaintiff testified that defendant had "a very nice shop" and advertised in the local paper representing that the quality of her work was "very good." Defendant testified that plaintiff was "in doubt and apprehensive" about her hair. "Mrs. Elliott is like all other customers. They are concerned about their hair but they know nothing about it. . . . She was leaving it up to me or she would not have come to me. She must have had faith in me."

When plaintiff arrived home after leaving defendant's beauty parlor "all my hair was on my shoulders. Then I looked in the mirror and it kept coming out. For almost a week or so it kept coming out." It took about eleven months for her hair to grow back. Plaintiff testified that the defendant came to her home and stated "I take the blame. I don't know what happened . . . it must have been some fault or something . . . I don't know." Defendant testified she told plaintiff she was sorry but cannot remember ever saying it was her fault.

The propriety of the verdict for the defendant on the count in negligence is not before us. The Trial Court properly did not submit to the jury plaintiff's claim of an express warranty as there was no evidence to sustain it. The only question to be determined is whether the Trial Court erred in submitting to the jury the issue of implied warranty.

This field of civil liability has undergone many changes in the past several years and "continues to develop at a rapid and fascinating pace." 19 Rutgers L. Rev. 692 (1965); *Dippel* v. *Sciano,* 37 Wis. 2d 443; Vol. III The Forum (ABA I. L.) 25, 36. The Uniform Commercial Code which became effective in New Hampshire on July 1, 1961 (RSA ch. 382-A) and Restatement (Second), Torts, *s.* 402 A have been significant factors in this evolution. 17 W. Res. L. Rev. 5; 50 Minn. L. Rev. 791; 19 Me. L. Rev. 181; 17 Bus. Law (ABA, CL) 157. See Annot. 13 A.L.R. 3d 1057.

RSA 382-A:2-314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . . (2) Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used."

RSA 382-A:2-315 provides that: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose."

Such warranties are not created by an agreement as such between the parties but are said to be imposed by law on the basis of public policy. They arise by operation of law because of the relationship between the parties, the nature of the transaction,

and the surrounding circumstances. *Chandler* v. *Anchor Serum Company*, 198 Kan. 571, 579; *Markovich* v. *McKesson and Robbins, Inc.*, 106 Ohio App. 265; *Henningsen* v. *Bloomfield Motors, Inc.*, 32 N. J. 358; Hursh, American Law of Products Liability 6:16; Prosser, Law of Torts (3d *ed.*) *p.* 651.

"It is evident that the warranties of particular purpose and merchantability can, and often do, coincide. This stems from the fact that the particular purpose for which a product is used can also be one of the general or ordinary uses of the product." 2 Frumer-Friedman, Products Liability (1968 *ed.*), *s.* 19.03 [2], *p.* 503. See Annot. 79 A.L.R. 2d 431, 444. "There are, of course, situations when only one of the two warranties can apply." 2 Frumer-Friedman, Products Liability, *p.* 505.

Such warranties, however, are subject to the Uniform Commercial Code provisions as to notice (RSA 382-A:2-607, 3(a)), disclaimer (*Id., s.* 2-316) and to whatever requirement of privity is imposed by *Id., s.* 2-318. *Dippel* v. *Sciano*, 37 Wis. 2d 443, 445; 19 Me. L. Rev. 181, 204-224. See *Lenz* v. *Company*, 88 N. H. 212, 214. Hence, there has arisen another remedy for matters treated as implied warranties under the Code. It imposes strict liability in tort for the sale of a defective product unreasonably dangerous to an intended user or consumer. *Dippel* v. *Sciano, supra,* 452; *Helene Curtis Industries* v. *Pruitt,* 385 F. 2d 841 (5th Cir. 1967); *Elmore* v. *American Motors Corporation,* 75 Cal. Rptr. 652. 655; *Greenman* v. *Yuba Power Products,* 59 Cal. 2d 57, 62. Restatement (Second), Torts, *s.* 402A.; Prosser, Law of Torts, *s.* 95; 50 Minn. L. Rev. 791; 31 Am. T. L. J. 243; 19 Rutgers L. R. 692. See Annot. 13 A.L.R. 3d 1057.

"Strict liability does not make the manufacturer or seller an insurer nor does it impose absolute liability." *Dippel* v. *Sciano, supra,* 459, 460. In other words, unlike absolute liability, the mere injury from a product does not create liability. "From the plaintiff's point of view the most beneficial aspect of the rule is that it relieves him of proving specific acts of negligence and protects him from the defenses of notice of breach, disclaimer, and lack of privity in the implied warranty concepts of sales and contracts." *Dippel* v. *Sciano, supra,* 460; Restatement (Second), Torts, *s.* 402A, *comments* i, m.

Whether proceeding under an implied warranty under the Uniform Commercial Code, or on a strict tort liability based

on a defective product which is unreasonably dangerous, the plaintiff has the burden of proving that her injury resulted from the unmerchantability or unsuitableness of the product, in the former case, or from a defect therein, in the latter instance. *Patterson* v. *Weyer, Inc.,* 189 Kan. 501, 504; *Dippel* v. *Sciano,* 37 Wis. 2d 443, 451. It is not enough for the plaintiff to show that the permanent wave solution was applied and that she subsequently suffered injury. Plaintiff must adduce proof of facts and circumstances warranting the conclusion that the product was unwholesome or not fit for the purpose for which it was intended. *Patterson* v. *Weyer, Inc.,* 189 Kan. 501, 504; "The cornerstone rule in products liability is that proof of mere injury furnishes no rational basis for inferring that the product was defective for its intended use." *Helene Curtis Industries* v. *Pruitt,* 385 F. 2d 841, 853 (5th Cir. 1967); 2 Frumer-Friedman, Products Liability, *s.* 16.03 [4]. See Annot. 13 A.L.R. 3d 1057, 1066.

It appears from the record in this case that four different products were applied to plaintiff's hair by the defendant on the day in question. There is no evidence as to the composition of any of them. There was no testimony that any one of such products was unfit for the ordinary purpose for which it was used or unsuitable for the particular use made by the defendant.

Plaintiff consulted her family doctor who saw her about four times in the month following her injury. His testimony consisted principally of treatments he prescribed for her extreme nervousness and anxiety as to whether her hair would ever grow in, and his suggestion "that she might consult a skin specialist." He did not prescribe anything for her scalp. Plaintiff testified she saw a specialist, Dr. Bienvenu, but he did not testify. There was no medical evidence that her condition was casually related to any product used by the defendant. *Patterson* v. *Weyer, Inc.,* 189 Kan. 501. Cf. *Newmark* v. *Gimbel's Incorporated,* 102 N. J. Super. 279. See Annot. 79 A.L.R. 2d 431, 447. Nor was there any direct evidence that plaintiff's injury resulted from a defect in a product used by the defendant which made it unreasonably dangerous for use on her hair. *Dippel* v. *Sciano,* 37 Wis. 2d 443, 451; *Helene Curtis Industries* v. *Pruitt,* 385 F. 2d 841, 853 (5th Cir. 1967); 19 Rutgers L. Rev. 692, 698. Furthermore the record does not contain sufficient circumstantial

evidence to establish such unfitness or causal defect. Cf. *Vandermark* v. *Ford Motor Co.,* 61 Cal. 2d 256, 263; *Elmore* v. *American Motors Corporation,* 75 Cal. Rptr. 652. See Annot. 13 A.L.R. 3d 1057, 1066.

We hold there is no evidence in the record from which the jury could reasonably find that any unfitness or defect in the products used by the defendant caused plaintiff's hair to fall as it did. "The mere fact that the plaintiff suffered injury is not sufficient to justify such a conclusion." *Lenz* v. *Company,* 88 N. H. 212, 215. Defendant's motion for judgment notwithstanding the verdict for the plaintiff should have been granted.

The result reached renders unnecessary the determination of whether or not defendant was a seller under the Uniform Commercial Code or was in such a relationship with the plaintiff as to come under its warranty provisions. RSA 382-A:2-313, *comment,* 2; *Newmark* v. *Gimbel's Incorporated,* 102 N. J. Super. 279; *Epstein* v. *Giannattesio,* 25 Conn. Sup. 109; 2 Harper and James, Torts, *s.* 28.19; Vol. III The Forum (ABA IL) 25, 26-28. Similarly it is unnecessary to consider if defendant is a seller under the rule of Restatement (Second), Torts, *s.* 402A. See *comment f; Garthwait* v. *Burgio,* 153 Conn. 284.

*Judgment for defendant.*

GRIFFITH, J., did not sit; the others concurred.