[S.F. No. 22785. In Bank. Mar. 24, 1971.]

JESSE JIMINEZ, Plaintiff and Respondent, v.
SEARS, ROEBUCK & COMPANY et al., Defendants and Appellants.

380

**COUNSEL**

Channell, McNamara & Lewis, McNamara, Lewis & Craddick, Daniel J. McNamara and Richard G. Logan for Defendants and Appellants.

Goodman, Herbert & Lucas and F. Richard Lucas for Plaintiff and Respondent.

**OPINION**

**PETERS, J.**—In this action for personal injuries, the jury returned a verdict for defendants. The trial court granted a motion for new trial, and defendants have appealed from the order granting the motion.

Plaintiff's testimony may be summarized as follows: He purchased a stepladder from defendant Sears, Roebuck & Company, and kept the ladder in a storage room in his backyard. A few days before the accident he sought to use the ladder to prune a peach tree, but the ground was too muddy, and he desisted. The only other time he used the ladder was when he wanted to place some Christmas gifts for his children in the attic of his garage. The garage has a cement floor, and he placed the ladder on the floor and proceeded to climb it carrying a toy car in his hands. While he was standing on the step next to the top one, the ladder broke, and he "probably" fell on it. As a result, his wrist was broken, and he suffered permanent disabilities. He did construction work and regularly used ladders. A few days after the accident, he returned the broken ladder to Sears and was given another one.

At trial the ladder had a broken left side rail.

Plaintiff and defendants presented expert testimony as to the condition of the ladder. Plaintiff's expert, a professor of engineering, emeritus, testified that the ladder did not comply with the American Standard Safety Code for the manufacture of ladders in three respects. First, he said that code required one six-penny nail or the equivalent thereof at the end of each step and reinforcement by a steel rod. There were no six-penny nails. Second, the lower step where it was notched into the broken rail was cut more deeply (3/16 of an inch) than permitted by the code and more deeply than the other notches. The deeper the notch the less rail is left. The

failure of the ladder occurred at this notch. Third, the wood used in the rail was of low density, and the code specifies that no wood of low density should be used.

One of defendants' experts, a former professor of forestry, testified that the ladder met all of the requirements of the code. He said that the ladder had a rod which compensated for the lack of a nail, that the notches were 5/32 of an inch as permitted by the code,[1] and that the wood in the rail was of medium density. It was his opinion that the failure of the ladder was caused by a sudden jolt and could have been caused by the plaintiff falling on it. The second expert called by defendants, a mechanical engineer and former teacher of mechanical design and metallurgy, gave similar testimony. He also testified that the ladder should never have been used on soft soil because as one ladder leg penetrates the load is unevenly applied to the other leg.

The court instructed the jury to find for plaintiff if it found that he used the product for its ordinary purpose, that it was defective and unfit for that purpose, that the defective and unfit condition existed when the product was put on the market by defendants, and that its condition was a substantial factor in causing injury to plaintiff. The court instructed the jury to find for defendant if it found that plaintiff was not using the product for its ordinary purpose, that the product was not defective or unfit for that purpose when defendants put it on the market, or that the product's condition was not a substantial factor in causing the plaintiff's injury.

Although plaintiff and defendants submitted instructions on specific acts of negligence, they were not given. The instructions are marked "withdrawn." The reporter was present during the discussion in chambers as to instructions, but her notes were lost. At the argument on the motion for new trial, defense counsel said that all negligence instructions were withdrawn. Plaintiff's counsel stated that it was his recollection that the judge, after examining authorities, stated that he felt it was not a negligence case and that then the instructions were withdrawn.

Plaintiff also requested an instruction on the doctrine of res ipsa loquitur. The court refused the instruction. The court also struck from its own general instructions those which set forth the law of negligence generally.

In granting the motion for new trial, the judge stated that under the pleadings and evidence plaintiff was entitled to have the issues of negligence and res ipsa loquitur go to the jury.

---

[1]The discrepancy in the testimony as to the depth of the notch at the point of break, a matter which each of the witnesses measured during the trial, may be due to a disagreement between the experts as to where the notch or sawed part ended and where the break in the wood began. However, this is not entirely clear.

Defendants urge that, where instructions are given on strict liability in tort in a products liability case, instructions on negligence and res ipsa loquitur would not benefit the plaintiff and are confusing to the jury, and that the failure to give such instructions in the instant case was not error and does not support the order granting the motion for new trial. It is pointed out that in a products liability case the plaintiff in order to recover in strict liability in tort must prove that he was injured by a defect in the product and that the product was defective when it left the hands of the retailer or manufacturer; whereas to recover in negligence the plaintiff must prove the same two elements plus an additional element, namely, that the defect in the product was due to negligence of the defendant.

Although seemingly it would always be simpler for a plaintiff in a products case to recover under a theory of strict liability in tort where only two of the three elements of the negligence cause of action are necessary of proof, this is not necessaily true, and in some situations it will be to the plaintiff's advantage to have negligence instructions.

In *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 62 [27 Cal. Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], we established the rule that a manufacturer is strictly liable in tort "when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." It is obvious that the manufacturer's strict liability depends upon what is meant by defect.

A defect may be variously defined, and as yet no definition has been formulated that would resolve all cases or that is universally agreed upon. (See Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 367 et seq.) In *Greenman, Vander-mark* v. *Ford Motor Co.,* 61 Cal.2d 256 [37 Cal.Rptr. 896, 391 P.2d 168], and *Elmore* v. *American Motors Corp.,* 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84, 33 A.L.R.3d 406], a defective product is viewed as one which fails to match the quality of most like products, and the manufacturer is then liable for injuries resulting from deviations from the norm: the lathe did not like other lathes have a proper fastening device, the brakes of the automobile went on unexpectedly, the drive shaft of a new car became disconnected.

The deviation-from-the-norm test does not provide a solution for all cases. It may be over inclusive, or it may be under inclusive, and it has been suggested that liability might be imposed as to products whose norm is danger. (See Traynor, *The Ways and Meanings of Defective Products and Strict Liability, supra,* 32 Tenn.L.Rev. 363, 367 et seq.)

In *Pike* v. *Frank G. Hough Co.,* 2 Cal.3d 465, 475 [85 Cal.Rptr. 629, 467 P.2d 229], decided subsequent to the trial in the instant case, we categorized a product in a defective condition as one which was "unreasonably dangerous" to the user, consumer, or bystander. (See Rest. 2d Torts, § 402A.) The case held that strict liability could be imposed for defective design of a product as well as defective manufacture. By focusing on unreasonably dangerous, this test of defect becomes similar to but not necessarily the same as the test for negligent design. (Compare discussion of negligence liability in *Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 470-474; Rest. 2d Torts, § 398.) Part of the problem, of course, is that over the years a considerable body of law has been developed as to negligence permitting definitive instructions based upon tested and settled principles; whereas the same development has not as yet occurred with respect to the more recent doctrine of strict liability in tort. For example, in *Pike* we pointed out in connection with the negligence cause of action that although reasonable care varies with the facts of each case, "it involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm. [Citation.]" (2 Cal.3d at p. 470.) In connection with the cause of action for strict liability in tort, we did not attempt to further define the term "unreasonably dangerous." In many cases, a plaintiff might well be benefited by resort to settled negligence principles and approved jury instructions.

In the instant case the instructions on strict liability used a third definition of defective product, one being unfit for its ordinary purpose, apparently a test based on merchantability, a contract principle. It may be noted, however, that plaintiff's expert testimony was designed to show deviation from the norm.

█ It is unnecessary to labor the difficulties of the defect concept further because it is apparent that under the facts of the case before us instructions on negligence would serve the plaintiff better than instructions on defect in several respects. One of the issues for the jury was the effect to be given to plaintiff's use of the ladder in the mud. A jury instructed on traditional negligence principles might well conclude that a ladder which would become weakened and dangerous after the minimal use by plaintiff was one that involved an unreasonable risk of bodily harm. In this connection, the jury might consider whether the exercise of reasonable care required the manufacturer to warn purchasers that the ladder should not be used on soft ground. (*Gherna* v. *Ford Motor Co.,* 246 Cal.App.2d 639, 651 [55 Cal.Rptr. 94]; *Crane* v. *Sears Roebuck & Co.,* 218 Cal.App.2d 855, 859 [32 Cal.Rptr. 754].)

On the other hand, the jury not having been instructed on negligence may have believed that the product as sold was safe and not defective for use on hard ground and concluded that it was not defective when sold notwithstanding that it believed that use on soft ground would be considered a normal use of the product.

Similarly, instructions on the doctrine of res ipsa loquitur may have been helpful to the plaintiff. In a products liability case, as in other cases, the conditions to application of the doctrine do not require proof of any particular defect but only a showing that the occurrence of the injury is of such a nature that it can be said in the light of past experience that it was probably the result of negligence of someone and that the defendant is probably the one responsible. (E.g., *Tomei* v. *Henning,* 67 Cal.2d 319, 322 [62 Cal.Rptr. 9, 431 P.2d 633]; *Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 441 et seq. [247 P.2d 344].) Accordingly, in a products liability case prior to the adoption of the *Greenman* and *Vandermark* rules of strict liability, the plaintiff would prove the conditions of the doctrine, which did not involve proof of the defect, and the jury would be told to draw an inference of negligent causation on the part of the defendant. Although that inference may have necessarily meant that there was a defect in the product, the plaintiff could prevail under the doctrine without identifying the particular defect. Nor would the fact that he had introduced some evidence as to particular defects preclude resort to the doctrine. (Cf. *Di Mare* v. *Cresci,* 58 Cal.2d 292, 299 [23 Cal.Rptr. 772, 373 P.2d 860].)

*Greenman* and *Vandermark* have not changed these rules. Although the science of accident investigation has proceeded apace, it obviously has not reached the point where the scientists are able to explain all accidents. When the coke bottle explodes as the plaintiff reaches for it in the vending machine (cf. *Zentz* v. *Coca Cola Bottling Co., supra,* 39 Cal.2d 436), when the motor catches fire shortly after the purchaser drives his car away from the dealer's garage (cf. *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639), or when the drive shaft of a recently purchased car becomes disconnected (*Elmore* v. *American Motors Corp., supra,* 70 Cal.2d 578), the plaintiffs' experts may not be able to tell us why the bottle broke, the motor caught fire, and the drive shaft became disconnected or may only be able to give weak evidence of the cause of the occurrences. In such cases, the plaintiff, assuming all requirements of the res ipsa loquitur doctrine are met, should be permitted to claim, and have the jury instructed, that from the happening of the accident an inference arises that the defendant manufacturer was negligent and that it is incumbent upon the defendant to meet or balance the inference. He should not be denied the inference of

negligence merely because he has presented some evidence of a defect or of specific acts of negligence.

The instruction on the doctrine cannot be said to be merely superfluous. A claim that a res ipsa loquitur instruction was merely superfluous was ably answered by Chief Justice Traynor in *Tomei* v. *Henning, supra,* 67 Cal.2d 319, 323-324. Although the case did not involve products liability but rather a defendant doctor who concededly unintentionally sutured plaintiff's ureter during a hysterectomy, the case is closely analogous, and its reasoning is directly in point. The doctor had claimed that the misplacing of the sutures and the failure to discover it was an unavoidable accident. Chief Justice Traynor for a unanimous court stated:

"We do not believe . . . that a res ipsa loquitur instruction would have been superfluous in this case. It would have focused consideration on the inferences that could be drawn from the happening of the accident itself as distinct from the inferences that could be drawn from the evidence of the specific procedures available to a surgeon to avoid suturing a ureter or to discover such suturing in time to correct it before closing the wound. . . . [T]he question was whether the exercise of reasonable care would have prevented [the suturing]. Properly instructed, the jury could pursue the answer to that question along two distinct routes. It could ask what did defendant do or fail to do that might have caused the accident. Under a res ipsa loquitur instruction it could ask whether it is more likely than not that when such an accident occurs, the surgeon was negligent. Since the verdict was reached without the benefit of a res ipsa instruction, it establishes only that the jury could not find negligence along the first route; it could not identify any specific negligent conduct. Had the instruction been given, however, the jury might reasonably have concluded that regardless of how the accident happened or how it could have been avoided, its happening alone supported an inference of negligence."

Similarly, here a res ipsa loquitur instruction would have focused consideration on the inferences that could be drawn from the accident itself as distinct from the inferences to be drawn, if any, from the expert testimony. In light of the conflicting evidence, the jury may have rejected plaintiff's expert's testimony and thus concluded that plaintiff failed to prove a specific defect in the design or manufacture of the ladder. Had the jury accepted plaintiff's own testimony as to his minimal use of the ladder and as to the accident and had the jury been instructed on the doctrine of res ipsa loquitur, it could reasonably find that it is more likely than not that when such an accident occurs, the manufacturer or seller of the ladder is negligent. Under the instruction, the jury could properly have concluded

that the happening of the accident itself warranted an inference of negligence and that the inference had not been balanced.

To put the matter another way, when a recently acquired ladder which has not been mistreated breaks in normal usage, there is an inference that the ladder was negligently constructed or designed. A plaintiff is entitled to the inference, and he may need it most in the very kind of case before us, one where the evidence is sharply conflicting as to any particular defect in design or construction. We cannot agree that the doctrine serves no purpose in a products liability case where the plaintiff has offered evidence of specific defects.

Prior cases of this court have assumed without discussing the point that a plaintiff in a products liability case could seek recovery at the same time on theories of strict liability in tort and in negligence. (*Pike* v. *Frank G. Hough Co., supra,* 2 Cal.3d 465, 474, 476; *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256, 261; *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d 57, 60; cf. *Gherna* v. *Ford Motor Co., supra,* 246 Cal.App.2d 639, 649-651.) No valid reason appears to require a plaintiff to elect whether to proceed on the theory of strict liability in tort or on the theory of negligence. It is apparent that in this products liability case instructions on negligence in addition to those on strict liability might have been of great aid to the plaintiff,[2] and we cannot agree with defendants' contention to the contrary.

Nor does it appear that instructions on the two theories will be confusing to the jury. There is nothing inconsistent in instructions on the two theories and to a large extent the two theories parallel and supplement each other. (See Prosser, *Strict Liability to the Consumer in California,* 18 Hastings L.J. 9, 50-58.) Far from causing confusion, in many instances instructions on negligence may be helpful to the jury.

The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside. (*Malkasian* v. *Irwin,* 61 Cal.2d 738, 747 et seq. [40 Cal.Rptr. 78, 394 P.2d 822]; *Shaw* v. *Pacific Greyhound Lines,* 50 Cal.2d 153, 159 [323 P.2d 391].)

---

[2]No doubt there are other situations where instructions on negligence would be helpful to plaintiff, but there is no need to discuss them here.

Although the instructions on specific acts of negligence are marked withdrawn, it is clear that the instructions on the doctrine of res ipsa loquitur were refused. Even assuming that the withdrawal of the former instructions would preclude plaintiff from relying upon them in support of the order granting the motion for new trial, the failure to instruct on the law of negligence generally and on the doctrine requires affirmance of the order.

The order granting the motion for new trial is affirmed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.