[Civ. No. 41235. First Dist., Div. Two. Dec. 19, 1977.]

VERNON F. SHEPARD et al., Petitioners, v.
THE SUPERIOR COURT OF ALAMEDA COUNTY,
Respondent;
RONALD RANDALL PORTER et al., Real Parties in Interest.

---

**COUNSEL**

Norman A. Sauer for Petitioners.

No appearance for Respondent.

Barfield, Barfield, Dryden & Ruane and Mattathias N. Smith for Real Parties in Interest.

---

**OPINION**

**TAYLOR, P. J.**—Petitioners seek a writ of mandate to compel respondent court to vacate its order sustaining without leave to amend the Ford Motor Company's demurrer to their causes of action seeking recovery in strict liability and warranty for *physical injuries* resulting from emotional shock suffered in witnessing the infliction of injuries and death upon close family members. We have concluded that petitioners are entitled to relief by prerogative writ.

The facts which give rise to the action are alleged in the complaint as follows: On October 17, 1976, at approximately 2 a.m., the Shepard family, returning home from a holiday in Reno, was proceeding in a westerly direction on Interstate Highway 80. Vernon Shepard was driving; his wife, Gloria, was a passenger in the right front seat; and their two minor children, Jean and Vernon III, were asleep in the rear carrying area of the family's 1975 Ford Pinto wagon. Gibson and Porter,

operating their automobile on Interstate Highway 80 in the same direction as the Shepards, lost control and negligently struck the left side of the Shepard Pinto. Because of a defect in the manufacture and/or design of the locking mechanism of the Pinto's rear door by Ford, the door opened and Jean and Vernon III were thrown onto the highway. The Gibson-Porter automobile ran over Jean, resulting in her death. Vernon, Gloria and Vernon III observed the accident and Jean's injuries and death, causing them mental shock, suffering and accompanying physical injuries.

In *Dillon* v. *Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316], the court upheld a cause of action for *physical injuries* flowing from a mother's emotional trauma in witnessing the death of her child. The court suggested that the cause of action should be sustained whenever the injury was reasonably foreseeable, "excluding the remote and unexpected" (p. 741). In order to limit the "otherwise potentially infinite liability" which might flow from every negligent act, the court listed the factors to be considered in determining reasonable foreseeability and whether the defendant owed the plaintiff a *duty of due care.* They are: "(1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship." (Pp. 740-741.) ▇ In *Dillon* and subsequent cases, the court has carefully limited its ruling to a case in which the plaintiff has suffered actual *physical injury* as a result of witnessing the infliction of injury upon a family member (*Dillon, supra,* p. 740; *Justus* v. *Atchison* (1977) 19 Cal.3d 564, 582 [139 Cal.Rptr. 97, 565 P.2d 122]; *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441, 450 [138 Cal.Rptr. 302, 563 P.2d 858]; *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 76 [137 Cal.Rptr. 863, 562 P.2d 1022]; *Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 892, fn. 1 [103 Cal.Rptr. 856, 500 P.2d 880]; *Hair* v. *County of Monterey* (1975) 45 Cal.App.3d 538, 542-544 [119 Cal.Rptr. 639]).

Petitioners' complaint alleged that Vernon Shepard was the father and Gloria Shepard the mother of Jean Shepard, and that Vernon Shepard III was the brother of Jean; that petitioners were together in the Pinto at the time of the accident, and that petitioners suffered emotional shock and *physical injuries* by observing the death of Jean and injuries to

Vernon. These allegations satisfy the criteria to sustain the cause of action in negligence set forth in *Dillon.*

Respondent court, however, accepted Ford's contention that petitioners were limited to recovery under the theory of negligence by reason of the court's statement in *Dillon* that "The basis for such claims must be the adjudicated liability and fault of defendant; that liability and fault must be the foundation for the tortfeasor's duty of due care to third parties who, as a consequence of such negligence, sustain emotional trauma." (*Dillon, supra,* p. 733.) We point out that in *Dillon,* there was no attempt to establish a case of strict liability and thus the issue before the court in the instant case was not even presented. Petitioners here contend that Ford owes a duty to petitioners on the related theories of strict liability and warranty. We agree.

Under *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], a manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection, proves to have a defect that causes injury to a human being (p. 62). To establish the manufacturer's liability, it is sufficient that plaintiff prove that, while using the product in the way it was intended to be used, he was injured as a result of a defect in design and manufacture, of which he was not aware. In *Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578, 586 [75 Cal.Rptr. 652, 451 P.2d 84], the court extended the doctrine of strict liability to cover injuries to bystanders, finding such injuries to be " 'a perfectly foreseeable risk of the maker's enterprise.' " (P. 586.) Under the theory of strict liability, as in negligence, the injury and harm must be "reasonably foreseeable" (*Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]). Vehicle manufacturers must take into consideration the possibility of accidents resulting in injury which are reasonably foreseeable from the defective design and manufacture of their products (*Horn* v. *General Motors Corp.* (1976) 17 Cal.3d 359, 366 [131 Cal.Rptr. 78, 551 P.2d 398]).

It has been held that a plaintiff in a products liability case may seek recovery at the same time on theories of strict liability in tort and in negligence for physical injuries directly inflicted (*Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92]). The court in *Jiminez* concluded that "No valid reason appears to require a plaintiff to elect whether to proceed on the theory of strict liability in tort or on the theory of negligence" (p. 387). We see no

logical reason why the same rule of multiple theories of recovery should not be extended to those who suffer *physical injuries* indirectly as a result of emotional shock, as contended in this case. By alleging the presence of the requirements listed in *Dillon,* petitioners have stated a sufficient cause of action. The injuries complained of are as much a foreseeable consequence of a defect in design and manufacture as of the negligence of the driver (*Dillon, supra,* p. 741) and the "potentially infinite liability" upon manufacturers, which Ford fears, will not arise by reason of the restrictions imposed by the court in *Dillon* which would apply equally to negligence, strict liability and warranty cases.

To permit recovery against the negligent driver and exempt the manufacturer responsible for the defective condition contributing to the injuries would defy common sense and be inconsistent with the realities of modern society. It would jeopardize "the viability of the judicial process for ascertaining liability for tortious conduct itself" (*Dillon, supra,* pp. 747-748; *Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224, 227 [74 Cal.Rptr. 749]). ■ Our conclusion is in consonance with the stated purpose of the courts in adopting the doctrine of strict liability, i.e., "to relieve the plaintiff from problems of proof inherent in pursuing negligence [citation] and warranty [citation] remedies, and thereby 'to insure that the costs of injuries resulting from defective products are borne by the manufacturers. . . .' [Citation.]" (*Cronin* v. *J. B. E. Olson Corp., supra,* p. 133.)

Let a peremptory writ of mandate issue as prayed for in the petition.

Rouse, J., concurred.

**KANE, J.**—I dissent.

As a threshold matter, it is important to note that California has long recognized the right to recover damages for *intentional* infliction of mental or emotional distress resulting in physical injury, and even for emotional distress alone, without consequent physical injuries, in cases involving extreme and outrageous intentional invasions of one's mental and emotional tranquility (*Alcorn* v. *Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 497-498 [86 Cal.Rptr. 88, 468 P.2d 216]; *State Rubbish etc. Assn.* v. *Siliznoff* (1952) 38 Cal.2d 330, 336-337 [240 P.2d 282]; *Perati* v.

*Atkinson* (1963) 213 Cal.App.2d 472, 474 [28 Cal.Rptr. 898]; *Vargas* v. *Ruggiero* (1961) 197 Cal.App.2d 709, 717-718 [17 Cal.Rptr. 568]; *Bowden* v. *Spiegel, Inc.* (1950) 96 Cal.App.2d 793, 794-795 [216 P.2d 571]; *Emden* v. *Vitz* (1948) 88 Cal.App.2d 313, 316-319 [198 P.2d 696]). It is also well settled that a plaintiff who sustains personal injuries may, in addition to other items, recover damages for mental suffering as well (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 893 [103 Cal.Rptr. 856, 500 P.2d 880]; *Deevy* v. *Tassi* (1942) 21 Cal.2d 109, 120 [130 P.2d 389]; 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 886, pp. 3171-3172). Finally, it is now possible to recover damages for *negligent* infliction of emotional distress resulting in physical injury in the narrow circumstances described in *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 740-741 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]. However, no authority has been cited or found permitting the recovery of damages for infliction of emotional trauma based on the doctrine of strict tort liability. We are confronted, therefore, not merely with the relatively insignificant question of whether certain kinds of damages are recoverable based upon culpable tortious conduct. Rather, we are squarely confronted with the very significant question whether such damages can be recovered for nonculpable conduct. In short, we are asked here to give birth to an entirely new cause of action, an invitation which should be rejected for the reasons which follow.

Under the broad rules laid down in *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57, 62 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], "A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being." The word "injury" used in *Greenman* has been consistently interpreted to mean "physical injury" or "physical hurts" occurring in the course of using the product. As our Supreme Court pointed out in *Seely* v. *White Motor Co.* (1965) 63 Cal.2d 9, 15 [45 Cal.Rptr. 17, 403 P.2d 145], "The history of the doctrine of strict liability in tort indicates that it was designed . . . to govern the distinct problem of *physical* injuries." (Italics added; see also *Helene Curtis Industries, Inc.* v. *Pruitt* (5 Cir. 1967) 385 F.2d 841, 849; 4 Witkin, Summary of Cal. Law (8th ed. 1974) § 829, p. 3125; 63 Am.Jur.2d, Products Liability, § 137 et seq.; 13 A.L.R.3d 1088, 1089.) This is in harmony with Restatement Second of Torts, section 402A, which provides in part that "(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for *physical harm* thereby caused to the ultimate user or consumer, or to his property . . ." (italics added).

It is thus evident that under presently existing law the strict liability of the manufacturer and other supplier of goods (hereafter manufacturer) extends no further than keeping the ultimate user or consumer harmless and safe from *physical* injuries caused by a defective product, and does not embrace the more subtle and intangible harm of emotional distress, even if the latter manifests itself in some kind of physical symptoms. The crucial question thus arises whether the limited duty of the manufacturer ought to be extended as a matter of judicial policy so as to entail the added liability for causing mental, as opposed to physical, trauma.

In answering this fundamental question, it is initially noted that in ruling on a general demurrer the dispositive issue ordinarily is (as here) that of duty; i.e., the existence of a duty of care owed by the alleged wrongdoer to the person injured or to a class of which he is a member (*Richards* v. *Stanley* (1954) 43 Cal.2d 60, 63 [271 P.2d 23]; *Routh* v. *Quinn* (1942) 20 Cal.2d 488, 491 [127 P.2d 1, 149 A.L.R. 215]). If the plaintiff does not, and cannot, show such a duty owed directly to him, the action must be dismissed. The determination whether the defendant owes a duty to the plaintiff is a question of law (*Goodman* v. *Kennedy* (1976) 18 Cal.3d 335, 342 [134 Cal.Rptr. 375, 556 P.2d 737]; *Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36]). Whether, in a specific case, the defendant will be held liable to a third person is a matter of judicial policy and involves the balancing of various factors, among which are: the extent to which the transaction was intended to affect the plaintiff; the foreseeability of harm to him; the degree of certainty that the plaintiff suffered injury; the closeness of the connection between the defendant's conduct and the injury suffered; the moral blame attached to the defendant's conduct; the extent of the burden to the defendant and the consequences to the community of imposing a duty with resulting liability for breach; and the availability, cost and prevalence of insurance for the risk involved (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496]; *Lucas* v. *Hamm* (1961) 56 Cal.2d 583, 588 [15 Cal.Rptr. 821, 364 P.2d 685]; *Biakanja* v. *Irving* (1958) 49 Cal.2d 647, 650 [320 P.2d 16, 65 A.L.R.2d 1358]). Or as we have put it recently, "the *imposition of a duty is ultimately a question of fairness* and the inquiry involves a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution [citations]." (*Totten* v. *More Oakland Residential Housing, Inc.* (1976) 63 Cal.App.3d 538, 545 [134 Cal.Rptr. 29].)

While it is true that in establishing the manufacturer's duty and his liability based thereon for product-caused injuries foreseeability of harm

has been said to be a key consideration, the determination of foreseeability in this context involves much more than a mere exercise in logic. Rather, it embraces policy and social considerations *limiting* the manufacturer's liability (*Pease* v. *Sinclair Refining Co.* (2d Cir. 1939) 104 F.2d 183 [123 A.L.R. 933]; *Helene Curtis Industries, Inc.* v. *Pruitt, supra,* 358 F.2d 841, 862). Indeed, in this sense the determination of the foreseeability of harm requires weighing and balancing the very same policy factors that are the ingredients and criteria of a duty of care. Therefore, approaching the question either from the viewpoint of duty of care or foreseeability of harm, the policy factors enumerated above must be carefully weighed and evaluated and among which the most important are: (1) whether the transaction upon which the liability is predicated was intended to affect the plaintiff; (2) whether the injury is certain in the sense that it is tangible, subject to proof and verification, and cannot be feigned; (3) whether the conduct of the defendant is culpable or blameless; and last, but not least, (4) whether the imposition of the new duty complies with the basic requirement of fairness to all by not placing an undue burden on the defendant and/or society as a whole.

In analyzing these individual policy factors, we first point out that petitioners here are not the immediate victims of the injury allegedly caused by the design defect of the automobile. They are, in point of fact, merely third persons, whose sole claim is that their emotional tranquility was disturbed by the eventuality that they happened to be on the scene of an accident and eyewitnessed a tragic event. In addition, the accident itself was caused by the intervening negligence of outside individuals who collided with the car in which petitioners and the deceased child were traveling. Although this unusual chain of events may be said to be foreseeable in the unlimited sense of the word, it is hardly questionable that the foreseeability of the precise occurrence here is nothing more than mere speculation. Approaching the question from the practical viewpoint of commercial dealings, it can hardly be said that the manufacturer in actuality envisioned or foresaw this bizarre sequence of events, much less that he intended to save not only the actual victim from physical injuries, but also the potential eyewitnesses from emotional trauma. In shorter terms, it means that from the standpoint of legal policy relating to creation of a duty, the transaction upon which real parties' liability is predicated was clearly not intended to protect petitioners from the alleged shock and emotional distress which happenstance followed the actual physical injury and death of the tort victim.

Turning to the second policy consideration, it is almost commonplace that the proving of emotional distress and the injuries allegedly caused by emotional disturbance is extremely difficult, to say the least. Medical studies conducted in this area indicate that only in a small, insignificant fraction of cases was it possible to prove that the injuries were in fact caused by psychic stimuli and did not derive from the person's subnormal resistance to such stimuli (cf. Smith, *Relation of Emotions to Injury and Disease: Legal Liability for Psychic Stimuli* (1944) 30 Va.L.Rev. 193, 281-285). In addition, the circumstance that the emotional distress resulted in the requisite physical injury is generally dependent upon the testimony of experts who in most instances widely differ from each other and frequently submit diametrically opposing views. As aptly pointed out in *Amaya* v. *Home Ice, Fuel & Supply Co.* (1963) 59 Cal.2d 295, 312 [29 Cal.Rptr. 33, 379 P.2d 513], the resolution of such conflicts by the jury "often borders on fancy when the causation of alleged psychoneural disorders is at issue." Considering the inherently elusive, intangible nature of emotional distress and the inordinate difficulty in proving it, the introduction of spurious claims is all but a virtual certainty. While there is an appealing simplicity in the view " 'That administrative difficulties do not justify the denial of relief for serious invasions of mental and emotional tranquility . . .' " (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 743), the fact still remains that the degree of certainty that a plaintiff suffered injury (as opposed to a mere possibility or probability based on conjecture or surmise) is an important policy factor in the process of determining whether a defendant ought to be held responsible upon a new cause of action.

The third policy aspect, i.e., the culpability of the defendant and the moral blame attached to his conduct likewise carries extremely great significance in deciding whether a duty of care be established in a novel situation. As mentioned earlier, historically the tortfeasor was liable for infliction of emotional distress only if his act was intentional and the resulting disturbance of a plaintiff's emotional tranquility was great (*Alcorn* v. *Anbro Engineering, Inc., supra,* 2 Cal.3d 493). Prior to 1968, when *Dillon* v. *Legg, supra,* was decided, the California case law firmly and consistently held that there could be no recovery for negligent infliction of emotional harm (*Amaya* v. *Home Ice, Fuel & Supply Co., supra,* 59 Cal.2d 295; *Vanoni* v. *Western Airlines* (1967) 247 Cal.App.2d 793 [56 Cal.Rptr. 115]; *Gautier* v. *General Telephone Co.* (1965) 234 Cal.App.2d 302 [44 Cal.Rptr. 404]; *Espinosa* v. *Beverly Hospital* (1952) 114 Cal.App.2d 232 [249 P.2d 843]). Being well aware that as a matter of history and legal policy the courts had been unwilling to hold the

tortfeasor liable for infliction of emotional distress in the absence of culpable conduct, the court in *Dillon* found it necessary to emphasize that *"The basis for such claims must be the* adjudicated liability and *fault of defendant*; *that* liability and *fault must be the foundation for the tortfeasor's duty of care* to third parties who, as a consequence of such negligence, sustain emotional trauma." (*Dillon* v. *Legg, supra,* 68 Cal.2d at p. 733; italics added.) By contrast, it is well settled that in an action based upon strict liability against a manufacturer, negligence or culpability is not a necessary ingredient (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113, 118 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986]; Rest.2d Torts, § 402A, com. a.[1]). As held in *Cronin* v. *J. B. E. Olson Corp.* (1972) 8 Cal.3d 121, 134-135 [104 Cal.Rptr. 433, 501 P.2d 1153], in order to prevail on the theory of strict liability a plaintiff is not required to show that a product is unreasonably dangerous to the user; rather, it is sufficient if he simply establishes that it contained a defect which caused him injury.

The logical conclusion flowing from the foregoing premises is unmistakable. *Dillon* makes it explicit that the fault of a defendant is an indispensable element of duty of care in an action brought for infliction of emotional distress, and that in the absence of fault or other culpable conduct a defendant may not be rendered liable for this particular harm. To put it another way, it means that in an action instituted for causing emotional trauma, the liability of a defendant is premised plainly and directly on the presence or absence of defendant's fault. Since the doctrine of strict liability is not founded upon fault or culpable conduct, a defendant manufacturer should not be held liable under this doctrine for the special harm of inflicting emotional distress upon a plaintiff. Under these circumstances, the attempt of the majority to transplant a cause of action which is rooted in, and inherently predicated upon, the notion of fault to a situation where fault is ruled out as a matter of law, is simply illogical and unreasonable.

The fourth policy criterion bearing on the issue of duty involves complex socio-economic considerations. To start with, it is noted that the avowed purpose of imposing strict liability upon the manufacturer is twofold: (1) loss-distribution or risk-spreading and (2) injury-reduction by enhanced safety. The first rationale, risk-spreading, holds the

---

[1]Comment a. of Restatement Second of Torts, section 402A, states in part that *"The rule is one of strict liability, making the seller subject to liability* to the user or consumer *even though he has exercised all possible care* in the preparation and sale of the product." (Italics added.)

manufacturer liable for injuries resulting from the use of his product because he is in the best position to distribute the loss either by insurance or by increasing the price of his product. As stated in *Greenman* v. *Yuba Power Products, Inc., supra,* 59 Cal.2d at page 63, the purpose of strict tort liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers who put such products on the market rather than by the injured persons who are powerless to protect themselves. Echoing the same idea, the court in *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262-263 [37 Cal.Rptr. 896, 391 P.2d 168], reemphasized that strict liability on the manufacturer affords protection to the injured person and works no injustice because the manufacturers can protect themselves through obtaining insurance and dispersing the cost through the prices of the products (see also (1976) 28 Baylor L.Rev. 745, 748). The second rationale, the theory of injury reduction, holds the manufacturer liable because he is in the best position to discover and correct the dangerous aspects of his products before any injury occurs (James, *General Products—Should Manufacturers Be Liable Without Negligence?* (1957) 24 Tenn.L.Rev. 923; Franklin, *Replacing the Negligence Lottery: Compensation and Selective Reimbursement* (1967) 53 Va.L.Rev. 774, 781; see also *Vandermark* v. *Ford Motor Co., supra,* 61 Cal.2d 256). Again, the manufacturer may pass on to the consumer the increased product costs by incorporating them in the purchase price of the merchandise.

Although since its inception the courts have generally tended to broaden the scope of products liability,[2] there are few cases, if any, which have embarked on a thorough and delicate analysis to explore whether the above stated policy goals are indeed promoted by the ever-expanding scope of enterprise liability. It is time for such an examination.

---

[2]As we remarked in *Shepard* v. *Alexian Brothers Hosp.* (1973) 33 Cal.App.3d 606, 612 [109 Cal.Rptr. 131], ". . . California cases have expanded the scope of the *Greenman* doctrine by imposing strict liability on retail dealers (*Vandermark* v. *Ford Motor Co., supra*); wholesale and retail distributors (*Barth* v. *B. F. Goodrich Tire Co.* (1968) 265 Cal.App.2d 228 [71 Cal.Rptr. 306]); home builders (*Kriegler* v. *Eichler Homes, Inc.* (1969) 269 Cal.App.2d 224 [74 Cal.Rptr. 749]); bailors and lessors of personal property (*McClaflin* v. *Bayshore Equipment Rental Co.* (1969) 274 Cal.App.2d 446 [79 Cal.Rptr. 337]; *Price* v. *Shell Oil Co., supra* [(1970) 2 Cal.3d 245 (85 Cal.Rptr. 178, 466 P.2d 722)]); and licensors of chattels (*Garcia* v. *Halsett* (1970) 3 Cal.App.3d 319 [82 Cal.Rptr. 420]). The standard of strict liability has been held to apply to a defect in design as well as a defect in manufacture (*Pike* v. *Frank G. Hough Co.* (1970) 2 Cal.3d 465 [85 Cal.Rptr. 629, 467 P.2d 229]) and extends not only to actual consumers or users, but to any human being to whom an injury from the defect is reasonably foreseeable (*Elmore* v. *American Motors Corp.* (1969) 70 Cal.2d 578 [75 Cal.Rptr. 652, 451 P.2d 84]; *Johnson* v. *Standard Brands Paint Co.* (1969) 274 Cal.App.2d 331 [79 Cal.Rptr. 194])."

The basic facts of economy teach us that the fashionable trend of a wholesale extension of strict liability proves to be counterproductive in many instances by hampering and arresting, rather than promoting, the policy objectives underpinning the doctrine. Thus, it requires no special economic expertise to realize that the double demand posed by the law, i.e., to make the product absolutely safe on the one hand, and to spread the cost of the ever increasing insurance premiums together with the expense of safety measures to the consumer on the other, becomes increasingly difficult, if not entirely impossible, to meet. It is well to remember that economic forces do not work in a vacuum, but rather in a strict and realistic economic environment where prices of merchandise are greatly influenced (if not entirely determined) by economic rivalry and competition. Under these circumstances, the fundamental assumption of spreading the risk of the enterprise to the consumers at large cannot be attained and materialized. While some portion of the ever growing safety and insurance cost may pass directly to the consumer by way of a higher dollar price, the remainder will take the form of decreased quality not affecting safety and decreased profits. The decreased profits affect the manufacturers first (among them mainly the large segment of small businessmen with limited or marginal capital who have to shoulder the strict enterprise liability side by side with the huge corporations), then society as a whole. The motion and realistic operation of economic forces have been graphically described by one observer as follows: "*Decreased profits, however, do not stop with the manufacturer.* He distributes them to the shareholders of his corporation, just as he distributes increased prices to the consumers of his product. Moreover, decreased profits do not stop with the shareholders. *Rather, in more or less attenuated form, they pass on to other, broader classes.* The major distribution of decreased profits occurs when shareholders switch their investment to other, more profitable enterprises. When this happens, the liability-bearing manufacturer's enterprise loses its ability to attract investment capital, resulting in decreased industrial activity. *This decreased activity results in losses to several categories. First, the consumer will feel the loss because the manufacturer's ability to produce a better, safer product will diminish. Second, reduced industrial activity will affect labor. Severely diminished profits may force the manufacturer out of business. Even less drastic reductions, however, could reduce the number of new jobs. Finally, reduced economic activity will affect the entire society,* in a more or less attenuated form, *through lower tax revenues, lower wages, and lower profits for distribution.*" (Alden D. Holford, *The Limits of Strict Liability for Product Design and Manufacture* (1973) 52 Tex.L.Rev. 81, 87, italics added.)

Paying heed to economic realities rather than our own fancy, the courts as a matter of judicial policy must stop the further extension of the strict liability of entrepreneurs, at least to areas where, as here, the determination of damages is speculative and conjectural rather than real and definable. In doing so, we are in line with established law which holds that the manufacturer is not an insurer of the product and that the strict liability of entrepreneurs may not be equated with absolute, limitless liability (*Elliott* v. *Lachance* (1969) 109 N.H. 481 [256 A.2d 153, 156]; *Helene Curtis Industries, Inc.* v. *Pruitt, supra*, 385 F.2d 841, 849; Traynor, *The Ways and Meanings of Defective Products and Strict Liability* (1965) 32 Tenn.L.Rev. 363, 366-367). As has been emphasized time and time again, in determining the parameters of enterprise liability we must draw a proper balance between the need for adequate recovery and the survival of viable enterprises (*Helene Curtis Industries, Inc.* v. *Pruitt, supra*, at p. 862; see also 28 Baylor L.Rev., *supra*, at pp. 748, 751). The guiding principles to achieve these goals are judicial temperance, evenhandedness and, first and foremost, fairness to all.[3]

The proposition set out above is greatly aided and supported by *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858] and its companion case, *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871]. In *Borer*, the question presented to the court was whether the children of a negligently injured mother were entitled to recover for loss of consortium, i.e., loss of services, companionship, affection and guidance of their mother. In *Baxter*, the issue was even closer to that presented in the instant case, namely, whether the parents of a child who was injured due to defendant's negligence had a valid claim for the loss of affection and society of their child.

In denying plaintiffs' claim in both instances, the Supreme Court first pointed out that while in creating a new cause of action one of the chief considerations is the foreseeability of harm, the eventual conclusion that injury to a legally recognized relationship, e.g., parent-child, is foreseeable does not by itself postulate the recognition of a new cause of action. The question rather is a matter to be determined by policy reasons rather

---

[3]In this regard, it is to be noted that petitioners will not be deprived of any claim for recovery of emotional distress damages for they have alleged valid causes of action under the theory of *Dillon* v. *Legg, supra*. In short, if they can prove *fault* on the part of real parties, such damages will be recoverable. All that I suggest is that in fairness they should not be entitled to such damages based upon a theory which is not predicated upon the concept of fault.

than sheer logic.[4] Emphasizing that every injury has ramifying consequences, like the ripplings of water without end, and that the problem for the law is to limit the legal consequences of wrongs to a controllable degree, the court cited *Suter* v. *Leonard* (1975) 45 Cal.App.3d 744, 746 [120 Cal.Rptr. 110], as follows: " 'Plaintiff's claim, viewed in the abstract and divorced from its surroundings, carries both logical and sympathetic appeal. . . . Nevertheless our decision must take into account considerations in addition to logical symmetry and sympathetic appeal. . . . [*N*]*ot every loss can be made compensable in money damages, and legal causation must terminate somewhere.* In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, a decision which is essentially political.' " (Italics added.) (*Borer* v. *American Airlines, Inc., supra,* at pp. 446-447.) The court then went on to analyze the underlying policy factors and concluded that plaintiffs were not entitled to recover under the proposed new cause of action because loss of consortium is an intangible, nonpecuniary loss which is difficult to prove; it would not adequately compensate the victims for the tragedy; and most of all, it would impose an extended and disproportionate burden on society which is the ultimate bearer of the inevitable increased insurance and administration costs. As the court stated, "We cannot ignore the social burden of providing damages for loss of parental consortium merely because the money to pay such awards comes initially from the 'negligent' defendant or his insurer. *Realistically the burden of payment of awards* for loss of consortium *must be borne by the public generally in increased insurance premiums* or, otherwise, in the enhanced danger that accrues from the greater number of people who may choose to go without any insurance. *We must also take into account the cost of administration of a system* to determine and pay consortium awards; since . . . the expense of settling or litigating such claims would be sizable." (*Borer* v. *American Airlines, Inc., supra,* p. 447; italics added.)

The court likewise rejected the parents' claim in *Baxter,* by stating that "The intangible character of the loss, which can never really be compensated by money damages; the difficulty of measuring damages;

[4]The majority's contrary conclusion is predicated entirely upon a premise of logic: "We see no logical reason why the same rule of multiple theories of recovery . . ." (majority opn., *ante,* pp. 20-21). But if logic is the sole criterion for establishing a new cause of action, the Supreme Court in *Borer* and *Baxter* would have been intellectually mandated to extend the claim of loss of consortium between spouses (*Rodriguez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669]) to the parent-child relationship as well.

the dangers of double recovery of multiple claims and of extensive liability—all these considerations apply similarly to both cases." (*Baxter v. Superior Court, supra,* 19 Cal.3d at p. 464.) Since the loss of consortium is "principally a form of mental suffering" (*Rodriguez v. Bethlehem Steel Corp.* (1974) 12 Cal.3d 382, 401 [115 Cal.Rptr. 765, 525 P.2d 669]), all that has been said in *Borer* and *Baxter* is equally applicable to the present case.

Lastly, it is to be noted that despite the ever expanding scope of the manufacturer's strict liability, the feudalistic notion that the tortfeasor must be held liable simply because he caused an injury regardless of fault or the existence of a duty to the injured person (cf. *Read v. J. Lyons & Co., Ltd.* (1947) A.C. 156, 171; *Dillon v. Legg, supra,* 68 Cal.2d 728, 734) has been effectively resisted by the California courts which in two notable instances have exonerated the manufacturer from responsibility. One, in spite of arduous arguments to the contrary, the Supreme Court refused to extend the strict liability doctrine to, and denied recovery for, economic loss alone (*Seely v. White Motor Co., supra,* 63 Cal.2d 9). Two, the California courts likewise consistently hold that the theory of strict liability does not obtain to services either. As we put it in *Shepard v. Alexian Brothers Hosp., supra,* 33 Cal.App.3d 606, 614, "those who sell their services for the guidance of others in their economic, financial and personal affairs are burdened only with a duty of reasonable performance under the circumstances and cannot be made liable in the absence of negligence or intentional misconduct." These latter examples but further underline that the strict liability of the manufacturer must have reasonable limits and that such liability by no means may be made equivalent to an unlimited or absolute responsibility.

Based upon the foregoing discussion, I cannot but conclude that the case law, the policy considerations spelled out above, and the principles of fairness all militate against the creation of a new duty rendering the manufacturer liable upon the faultless doctrine of strict liability for the disturbance of the emotional tranquility of third party plaintiffs. As pointed out earlier, in the absence of a duty the challenged counts failed to state a cause of action and the demurrer was therefore properly sustained without leave to amend. I would deny the petition for a peremptory writ of mandate and discharge the alternative writ previously issued.

The petition of real party in interest Ford Motor Company for a hearing by the Supreme Court was denied February 16, 1978. Clark, J., was of the opinion that the petition should be granted.