Filed 2/10/25  Meikle v. County of Orange CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CAROLE MEIKLE, Individual and as Personal Representative, etc., | |
| Plaintiff and Appellant, | G061912 |
| v. | (Super. Ct. No. 30-2018-00973047) |
| COUNTY OF ORANGE, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a postjudgment order of the Superior Court of Orange County, Theodore R. Howard, Judge. Affirmed.

V. James DeSimone Law, V, James DeSimone and Ryann E. Hall, and Bohm Law Group and Zane E. Hilton, for Plaintiffs and Appellants.

Lynberg & Watkins, Norman J. Watkins and S. Frank Harrell, for Defendant and Appellant.

On May 6, 2017, the Orange County Coroner's Office (Coroner's Office) erroneously identified the body of a deceased male as belonging to Francis M. Kerrigan ("Frankie") and informed his father Francis J. Kerrigan (Kerrigan) and his sister Carole E. Meikle (Meikle) that Frankie had died. After the body was buried, Frankie turned up alive. Kerrigan and Meikle (collectively Plaintiffs) sued respondent the County of Orange (County) for negligence, negligent misrepresentation, and intentional misrepresentation, seeking damages for their serious emotional distress. A jury returned special verdicts in Plaintiffs' favor on all counts, and awarded Kerrigan $1.2 million and Meikle $400,000.[1]

The County filed a post-trial motion for judgment notwithstanding the verdict (JNOV) and alternatively for a new trial as to all counts. The trial court granted a JNOV on the intentional misrepresentation claims only, but granted a new trial on the remaining claims and on the issue of damages. Plaintiffs appealed the grant of JNOV on the intentional misrepresentation claims and the grant of a new trial, and the County cross-appealed from the denial of JNOV on the other claims.

Relying primarily on language in *Thing v. La Chusa* (1989) 48 Cal.3d 644 (*Thing*), the County contends that as a matter of law, plaintiffs cannot recover for emotional distress merely from learning about the death of a deceased family member. We disagree and conclude the referenced language is not applicable to the case here.

Plaintiffs argue there was substantial evidence to support the

---

[1] Kerrigan died while this appeal was pending, and Meikle, the executor of his estate, was substituted as the plaintiff on all his claims. For clarity, however, we will continue to refer to Kerrigan in the opinion. No disrespect is intended.

jury's special verdicts on the intentional misrepresentation claims. We conclude, however, there was insufficient evidence to show scienter or intent to defraud, which are elements of the claims.

Plaintiffs also argue the trial court abused its discretion in granting a new trial. As discussed below, we conclude the trial court provided valid reasons to support the grant of a new trial on the negligence-based claims and defer to its exercise of discretion. Accordingly, we affirm.

STATEMENT OF THE FACTS

I

STIPULATED FACTS

On May 6, 2017, at around 11:55 a.m., a Fountain Valley police officer called the Coroner's Office to notify them of a death of an apparent homeless man who was found near a Verizon Wireless store located in Fountain Valley, California. The officer informed Senior Deputy Coroner David Ralsten that, while there was no exact identification of the deceased at that time, he believed the identity of the deceased was Frankie, based on his prior experiences with local law enforcement.

Ralsten printed a copy of Frankie's Department of Motor Vehicle (DMV) image record, which contained a photograph of Frankie, and brought it with him to the scene. Ralsten arrived at the store around 12:40 p.m., and investigated the reported death by examining the body of the deceased, examining the area, and taking photographs. Ralsten searched the body of the deceased, the deceased's personal possessions, and the area around the scene where the body was discovered to ascertain any identifying information, but did not find any. Using the DMV record, Ralsten made visual comparisons with the deceased. Based on what he perceived as shared characteristics between the deceased and Frankie, Ralsten believed the

3

deceased was Frankie and identified the body as that of Frankie.

At approximately 3:00 p.m. the same day, Kerrigan received a note from the Riverside County Sheriff's Office directing him to call the Orange County Coroner's Officer regarding his son Frankie. Shortly after receiving the note, he called the Coroner's Office and spoke with Megan Meier, who informed him that his son was deceased.

The body of the deceased was transported to the Coroner's Office, where fingerprints were taken on May 6. The fingerprints were sent to the Federal Bureau of Investigation (FBI), the Department of Homeland Security, the State of California Department of Justice and local law enforcement databases for comparison with fingerprints in their databases. The results from the federal, state, and local databases were electronically sent back to the coroner's computers on May 6 and May 7. The Coroner's Office misconstrued the returned messages and concluded the fingerprints taken off the body did not return any hits, when a hit did come back for John Dean Dickens, not Frankie.

The autopsy of the deceased was performed on May 9, and the body was released to the funeral home on May 9. An open-casket wake was held for Frankie's immediate family on May 11. On May 12, the funeral was held, and the body interred. On May 23, Kerrigan received a phone call from a family friend who informed him that Frankie was alive.

On May 30, a Kerrigan family representative notified the Coroner's Office that Frankie was alive. On June 1, the Coroner's Office informed the Kerrigan family representative that the deceased was John Dean Dickens. The body was exhumed on August 23. The County paid Kerrigan $20,558.59, which he acknowledged covered all expenses for the funeral, mass, and burial.

## II

### TRIAL TESTIMONY

*A. Senior Deputy Coroner David Ralsten*

Ralsten testified that after receiving the call from Officer McCrae, he printed out the DMV record, which had a 2005 photo of Frankie and indicated his weight was 180 pounds at the time. When he arrived at the scene, he observed a wheelchair nearby. He also noted the remains weighed roughly 250 pounds. However, Ralsten never specifically informed anyone to follow up on the wheelchair or the weight of the deceased.

Ralsten testified he observed similarities between the 2005 DMV photo of Frankie and the face of the deceased, including: "Both eyes are blue. The hair color was approximately the same. The chin shape. The fullness of the chin. . . . They both appeared to have a cleft in the chin. The width of the nose. The length of the nose. The set of the eyes. The set of the ears. And the hairline."

After his investigation at the scene, Ralsten returned to his office and began documenting his observations at around 2:30 p.m. Among the notes he inputted was: "Identification of [Frankie] by A. McCrae. Method: Driver's License." Ralsten pulled Frankie's DMV and criminal records, and learned Frankie had been arrested two weeks earlier and his father was Kerrigan. Ralsten then left for his vacation, and was not present when the body was transported to the Coroner's Office that evening.

Ralsten knew fingerprints would be taken and sent to other agencies via the LiveScan program. He anticipated the fingerprints would confirm his identification of Frankie, but never asked any other deputy coroner to follow up on fingerprint verification. Nor was he aware that any

5

deputy coroner was assigned specifically to follow up on the fingerprint verification process.

On May 8, a supervising deputy coroner sent out an e-mail with LiveScan results to Ralsten, Megan Meier, and other deputy coroners. For Frankie, the DOJ reported: "The subject, Frank Kerrigan was not identified as having a record in our files." Ralsten explained that the lack of a match or "hit" could be the result of the poor quality of fingerprints due to trauma or age or other reasons. Ralsten acknowledged that, in 2017, the Coroner's Office provided little to no training on the LiveScan system to its employees.

When Ralsten returned from his vacation on May 17, he spoke with Kerrigan, who asked about personal property that Frankie usually carried with him. This was the first time Ralsten had any concern about his identification. After noting that the electronic death registration system indicated the body had been embalmed, Ralsten asked Kerrigan if he had seen the body in the casket. When Kerrigan verified he had viewed the body, Ralsten asked, "It was Frankie, right? It was your son?" Kerrigan responded in the affirmative. Ralsten explained he asked the questions to confirm his identification of the body as that of Frankie. When Ralsten learned that Frankie was alive on May 31, he realized he had made a "horrific" mistake. He was very upset with himself.

B. *Deputy Coroner Megan Meier*

Meier testified she had no information about the deceased when Kerrigan called into the Coroner's Office on the death notification line on May 6. She never participated in identifying the body. When Kerrigan called, Meier verified he was related to Frankie and informed Kerrigan his son had died. She informed Kerrigan of the general location where the body was found and Kerrigan responded, "'That was where he was known to hang out.'"

6

Meier also asked questions such as the legal next of kin, but Kerrigan was unable to answer most of her questions due to being upset. Meier did not recall Kerrigan asking whether he had to come into the office to identify the body. However, as a general rule, when family members request to come into the office to identify a body, Meier would inform them that there are no viewing facilities at the Coroner's Office and the bodies would be identified via fingerprints. She did not tell Kerrigan the body had already been identified by fingerprints. She did not follow up with Kerrigan about fingerprint confirmation because that was not her job.

## C. Coroner "Kelly"

Meikle allegedly talked with a person at the Coroner's Officer named "Kelly" on May 7. Kelly Estrada, a senior deputy coroner in May 2017, testified she did not recall speaking with Meikle. The case file also has no notation indicating Estrada spoke with anyone about Frankie. The only other "Kelly" who worked in the Coroner's Office at the time was Kelly Keyes, but the parties stipulated she was not working on May 7.

## D. Francis J. Kerrigan

Kerrigan, who was 86 years old at the time of trial, testified he has three children: Frankie, age 62 years old, Meikle, age 60, and John, age 59. When Frankie was 43, he suddenly manifested symptoms of mental illness. After taking antipsychotic medication, Frankie was able to treat his illness and even work. However, Frankie often would stop taking his medication, which would result in him losing his job or becoming greatly disabled and disappearing for a period of time. Kerrigan, Meikle, or John would have to go find him.

Kerrigan testified that when he spoke with Meier on May 6, 2017, she told him, "I hate to have to tell you this over the telephone, Mr.

7

Kerrigan, but your son Frankie is deceased." His immediate response was, "Do I have to come in and identify . . . his body?" Meier answered, "No. No, sir, he's already been identified by his fingerprints." Kerrigan was "horrified and sad." Kerrigan was surprised because he had just spoken with Frankie two days before, and although Frankie was mentally ill, "he was never physically ill in that way."

After getting off the call, Kerrigan hugged his wife and they cried and started grieving Frankie's death. Kerrigan then called Meikle and John to inform them about their brother's death. About three to four hours later, Meikle and John came to his house, and they all talked about Frankie and cried.

The next morning, Kerrigan and his wife went to the scene where the body was found. He observed a memorial that Meikle had set up at the location. Kerrigan wanted to find anything of Frankie that could serve as a remembrance so he began looking around the area, including inside nearby bushes, where he found a boot.

Kerrigan and various family members then made arrangements for the funeral and burial that afternoon and the following day. A wake was held on May 11, for eight immediate family members, including Kerrigan and Meikle. At the wake, Kerrigan went up to the casket, touched the hair of the deceased and said goodbye.

After the funeral, the body was buried in a gravesite near where Frankie's deceased mother was buried. The burial occurred on May 12, a Saturday, and on the following Monday, Kerrigan began going over the personal property recovered with the body. He noticed that some of the personal property appeared to be items that Frankie would not have possessed. Additionally, items that Frankie usually carried, such as a black

8

attaché case, were not present. Kerrigan called the Coroner's Office to inquire about the personal possessions and later received a call back from Ralsten, who stated that sometimes "homeless" people would trade things. Kerrigan recalled Ralsten asking about viewing the body, but he did not know "what [Ralsten] was referring to."

On May 23, Kerrigan received a call from a family friend who was a pallbearer at the funeral. The friend told Kerrigan that Frankie was alive. Kerrigan asked then friend to "put Frankie on the phone," and spoke with Frankie briefly. Kerrigan testified it was "amazing" to learn Frankie was alive. He stated: "I was overjoyed for about a minute, and another minute, I was, 'Oh, my God, there's a stranger in Frankie's grave.' And that was a big, big concern of mine." Kerrigan then called Meikle and John to inform them of the news.

The next day, Kerrigan drove to the friend's house to see Frankie. Afterwards, Kerrigan began seeking advice on how to exhume the body that had been buried. He met with an attorney "right away," "the next day" after finding out Frankie was alive. Kerrigan also began trying to understand how or why the misidentification occurred. He became worried about Frankie's safety because "nothing was happening" about exhuming the body buried in the gravesite. Kerrigan also went to the media. While examining the various documents, including the autopsy report and Ralsten's case notes, Kerrigan noticed discrepancies that led him to believe that the body which was buried was not the body examined in the autopsy report, and the Coroner's Office had switched the bodies. The whole ordeal caused him to become less optimistic in general.

E. *Priscilla Kerrigan*

Priscilla Kerrigan testified she married Kerrigan in 2009, when

she and Kerrigan were widowed. When she first met Frankie, he already was displaying symptoms of mental illness. When Kerrigan was on the phone with Meier, she observed that he was "obviously upset" and "the blood . . . drained from his face." After getting off the phone call, Kerrigan told her that Frankie had died and he "did not have to go and identify the body because it had been identified through fingerprints." When they went to the scene where the body was found, Kerrigan "got down on his hands and knees in the bushes in the area . . . and he was crying and picking things up and putting them in a bag." At the wake, Priscilla took a "quick look" at the face of the body and had no doubt that Frankie was in the coffin.

When Kerrigan learned that Frankie was alive, he had a look of "happiness and shock all wrapped up onto one." The ordeal caused Kerrigan to become less optimistic and he is not the same man that she married.

*F. Carole E. Meikle*

Meikle testified she and her brother were very close. After Frankie began suffering from mental illness, she worked collaboratively with Kerrigan and John to obtain treatment for Frankie. When Meikle heard that Frankie had died, she was "devastated," "very, very sad" and began crying. After learning about the location where the body was found, Meikle decided to go to the scene and set up a sidewalk shrine for Frankie. While at the scene, she noticed a spot of blood which caused her to fear that something violent had happened to Frankie. The next day, she called the Coroner's Office and spoke with a person named "Kelly," whom she believed was Kelly Estrada. Meikle relayed she saw blood at the scene, and Kelly responded that Frankie had died peacefully, that he was lying on his side or his back by his wheelchair. Meikle stated Frankie did not have a wheelchair and could walk 50 miles. Kelly responded, "Oh, these people, homeless people, they collect

10

things." Meikle asked whether cigarettes were found, and Kelly stated there was a wallet, identification, and $56.

Meikle did not want to have an open-casket wake because the family had an open-casket wake for her mother 10 years prior and it was very upsetting and disturbing to her. Nonetheless, out of respect for Kerrigan's wishes, they held an open-casket wake. Meikle, however, did not look at the body inside the casket because she "never wanted to see any other loved one in the state of death after the experience with" her mother.

When Meikle learned that Frankie was alive, she fell to her knees in shock. She was joyful, but also could not understand how it happened. Meikle called people who came to the funeral to inform them about the good news. She did not contact the Coroner's Office to inform them about their mistaken identification, but had an attorney do so. When the body was not immediately exhumed, she was bothered and went to the gravesite frequently. She also had doubts the body sent to the family, identified as Frankie, was the body found at the Verizon store. Meikle testified the misidentification and statements regarding her brother's death still impact her because she lacks trust in law enforcement, and developed stress, anxiety, claustrophobia, and depression. She also testified she developed stress-related kidney stones.

On cross-examination, Meikle denied ever being afraid of her brother. At her deposition, however, she stated she was afraid of Frankie when he exhibited schizophrenic behavior. On re-direct examination, she clarified that she was scared to observe her brother speaking as multiple personalities.

After Meikle was informed that Frankie was alive, she went to see a lawyer in response to Kerrigan's request to seek out help. Meikle did

11

not see Frankie until two weeks later. Upon learning that Frankie was alive, Meikle did not realize or understand that the Coroner's Office had made a mistaken identification. However, she later testified she was "suspicious" of the Coroner's Office on "Day One."

Meikle denied that another area of her life caused her tremendous stress aside from the misidentification of the body. However, she acknowledged that in 2019, she filed for reorganization of her business in bankruptcy court; she had a substantial IRS tax arrearage; and her house was in default. Meikle also acknowledged that in the bankruptcy case, she stated in a court filing that any personal health issues arising from the mistaken identification were resolved. Meikle denied that the bankruptcy filing, tax liability, and default was "necessarily" stressful. On re-direct, she admitted that "business finances can be stressful."

G.  Terry Meikle

Terry Meikle, Meikle's husband, testified that after Meikle was informed that Frankie had died, she was sad and worried about Kerrigan. At the wake, Terry kissed his own hand and placed it on the body's forehead as a goodbye gesture. At the time, he had no doubt the body in the casket was Frankie.

After Meikle learned Frankie was alive, her reaction was, "This is great. He's back. Frankie's back." Meikle also expressed concern about who was buried in the gravesite. Asked about any lingering effects from being told Frankie had died, Terry testified that "[Meikle] was affected deep in her core to where she couldn't really get over seeing her brother die, even though he came back." On cross-examination, he acknowledged that at his deposition, he stated that after learning Frankie was alive, [Meikle] was "a lot happier at having her brother back" and "she hadn't changed from being happy."

12

# III

## RELEVANT PROCEDURAL HISTORY

The jury found the County liable on the claims for negligence, negligent misrepresentation, and intentional misrepresentation. It awarded Kerrigan $900,000 for past non-economic damages and $200,000 for future non-economic damages, and Meikle $200,000 for past and $200,000 for future noneconomic damages.

The County then filed a post-trial motion for a JNOV as to all three claims, and alternatively, requested a new trial on the issue of damages. The JNOV motion was based on the grounds there was insufficient evidence to prove serious emotional distress and insufficient evidence to prove intentional misrepresentation. The new trial motion sought a new trial based on failure to prove serious emotional distress and excessive damages. Plaintiffs opposed the motions, arguing substantial evidence supported the jury's special verdicts that they suffered serious emotional distress; the Coroner's Office intentionally or recklessly misrepresented facts; and the damage awards were not excessive.

The trial court granted JNOV on the intentional misrepresentation claims. As to Kerrigan's claim, the court found no evidence supported the jury's finding that Ralsten or Meier intentionally or recklessly misrepresented that the body of the deceased was that of Frankie because Ralsten's identification was based on a visual comparison with an old DMV photo of Frankie and he was confident in that identification until at least a week after Frankie turned up alive. It also found no evidence that Ralsten had an intent to defraud anyone. The court granted JNOV as to Meikle's intentional misrepresentation claim for the same reasons.

13

The court denied JNOV on all claims based on insufficient evidence to prove serious emotional distress, but granted a new trial on any remaining claims based on the same ground. It concluded the wrongful identification did not cause "*serious* emotional distress to [Plaintiffs] that has endured for more than [five] years and will go on into the future as this jury found even though Frankie was found to be alive in 17 days and has been with [Plaintiffs] ever since. The Court disagrees with the verdict of the jury in this regard. Any emotional injury could not have been caused by the discovery that Frankie was alive." It further concluded damages for a transient emotional reaction is not recoverable. The court also found any lingering emotional distress was due to appellant's "illogical and unsupportable persistent belief that the County switched bodies with one that looked like Frankie and then covered it up. This unreasonable pain and upset were not . . . caused by the negligence attributable to the County."

The court also granted a new trial on the misrepresentation claims for the same reasons discussed in addressing the JNOV motion. Additionally, it found Meikle was not credible about her conversation with Deputy Coroner "Kelly," including alleged additional misrepresentations about what was found with the body, or her conversation with Meier. The court concluded any false "statements, if even made, do not satisfy the evidence needed to support the jury's verdict or its finding on the elements of scienter and intent to defraud." It also noted Meikle's lack of credibility on suffering serious emotional distress (discussed in connection with damages below).

Finally, the court granted a new trial on the damages based on the following findings:

14

"1. Carole Meikle's testimony lacked credibility based, in part, on the following:

"a. The Court's observation of the manner and demeanor that this witness demonstrated in giving testimony, caused the Court to doubt her credibility and this was particularly true in testifying about her continued emotional distress after learning that Frankie was alive on May 23, 2017.

"b. Ms. Meikle's adherence to the unproven and illogical theory that there had been a body switch as part of a coverup by the coroner's office. [Citation.]

"c. Her[] testimony that she was never afraid of Frankie versus her deposition testimony to the opposite. [Citation.]

"d. Her testimony she didn't look at 'Frankie's' embalmed body at the wake on May 11, 2017.

"e. Her testimony that her happiness at learning of Frankie being alive and well on May 23, 2017, lasted only a minute, as compared with the testimony of her husband Terry in his deposition that she was happier having her brother back, and she did not subsequently change. [Citation.]

"f. The testimony regarding her bankruptcy disclosures demonstrated evasion. [Citation.]

"2. The period that Ms. Meikle thought her brother was deceased was the 17 days between May 6 and May 23, 2017. This was almost 5 years ago, now. She has had her brother in her life for all that time.

"3. The lack of any sort of professional treatment for the alleged 'serious' emotional distress at any time after the coroner's error.

"4. The evidence that the day after Frankie turned up alive her object and concern was getting a lawyer. [Citation.]

15

"In short, the Court finds there is insufficient evidence to support the award the jury made to this plaintiff for future non-economic damages and even the amount of the past non-economic damages.

"Now turning to the similar damages awarded to [Kerrigan], based on reasons 1(b), 1(d), 2, 3 & 4 above found in similar testimony by the father, the Court finds the evidence to support the future non-economic damages to be similarly insufficient. It appears to the Court that from the time that Frankie came up alive, the purpose of this 5-year effort has been to prove the illogical contention that there was a widespread effort to try and cover up the error in the misidentification of the body found on May 6, 2017, by switching bodies somewhere between the Verizon store in Fountain Valley and the Coroner's Office in Santa Ana.

"The Court similarly found the award of $900,000 in past non[]economic damages to [Kerrigan] and $200,000 to . . . Meikle was excessive and not supported by the Court's review of the record."

DISCUSSION

I

JNOV MOTION

"The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict. [Citation.] 'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support.' [Citations.] On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. [Citations.] If there is, we must affirm the denial of the motion.

16

[Citations.] If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo. [Citation.]" (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.) "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and '"substantial" proof of the essentials which the law requires in a particular case.'" (*Conservatorship of O. B.* (2020) 9 Cal.5th 989, 1006.) "We independently review the substantiality of the evidence. [Citation.] Of course, the substantiality of the evidence is measured against the elements the plaintiff must prove; what those elements are, and what they mean, are questions of law that we also independently review." (*Lopez v. City of Los Angeles* (2020) 55 Cal.App.5th 244, 253.)

A. *Intentional Misrepresentation Claims*

"'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) The trial court here granted a JNOV on the intentional misrepresentation claims because it concluded there was insufficient evidence to establish scienter or intent to defraud. The court concluded although it was false to represent that the body of the deceased was Frankie, that representation was based on Ralsten's misidentification, and no evidence suggested any coroner knew the identification was false when the representation was made or that Ralsten was reckless in making his identification based on a visual comparison.

Plaintiffs do not challenge the trial court's conclusion that there was insufficient evidence to show scienter or intent to defraud beyond a mere

17

assertion that "there is significant evidence [Ralsten] was reckless" without any further elaboration or record citation. Accordingly, they waive any claim of error relating to the misrepresentations that Frankie was dead. (See *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["[W]e may decide that the appellant has waived a point urged on appeal when it is not supported by accurate citations to the record. [Citations] Similarly, we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt"].)

Instead, Plaintiffs argue the trial court erred in ignoring three other misrepresentations that would support the jury's verdict on the intentional misrepresentation claims. First, they argue "[t]he shipping of a mislabeled body in and of itself is a misrepresentation." No legal authority, however, is provided for this contention. More important, no evidence showed who mislabeled the body before shipping the body and when the mislabeling occurred. Thus, there is no evidence for any reasonable jury to infer scienter or intent to defraud. This alleged misrepresentation therefore does not support the jury's verdict.

Second, Plaintiffs argue Meier falsely represented to Kerrigan that the body had been identified as Frankie based on fingerprints when she was or should have been aware that fingerprinting verification had not occurred. However, even if the representation was false or made with reckless disregard for the truth, there is no substantial evidence Meier had the intent to defraud when she made that false representation. Additionally, there is no substantial evidence that the false representation about the manner in which the body was identified caused serious emotional distress to Plaintiffs. Plaintiffs suffered serious emotional distress because they were informed

18

that a loved one had died, not because the body had been identified in a specific routine manner. This misrepresentation thus does not support the jury's verdict.

Finally, Plaintiffs contend Estrada falsely represented to Meikle that the body was found with a wallet, identification and $56. Assuming this false representation occurred—as we do when reviewing a challenge to the JNOV order—there is no evidence in the record that Estrada had the intent to defraud when she made the statement. Additionally, there is no substantial evidence this misrepresentation caused Meikle serious emotional distress. Again, Plaintiffs claimed to have suffered serious emotional distress because they were mistakenly informed a loved one had died, not because they were informed the body was found with various common items. In sum, Plaintiffs have not shown the trial court erred in granting JNOV as to the intentional misrepresentation claims.[2]

*B. Negligence and Negligent Misrepresentation Claims*

In its cross-appeal, the County contends the trial court erred in denying JNOV on the negligence-based claims because emotional distress from learning of a loved one's death is not recoverable. The sole basis for this contention is language from the California Supreme Court's opinion in *Thing*, *supra*, 48 Cal.3d 644. There, the high court discussed the single "narrow

---

[2] We note some language in the County's appellate brief suggests the trial court granted a JNOV as to the negligent misrepresentation claims. Whether this mischaracterized the court's order or whether the court actually granted the JNOV is immaterial because the court's findings on scienter and intent to defraud do not apply to negligence misrepresentation claims. (See *Gagne v. Bertran* (1954) 43 Cal.2d 481, 487-488 [tort of negligent misrepresentation does not require scienter or intent to defraud].) Accordingly, the negligence misrepresentation claims are not subject to JNOV here.

19

issue" of whether "a mother who did not witness an accident in which an automobile struck and injured her child may recover damages from the negligent driver for the emotional distress she suffered when she arrived at the accident scene." (*Id*. at p. 646-647.) The high court characterized the case as a "'bystander'" case versus a "'direct victim'" case. (*Id*. at p. 647.) "[I]n that context," (*ibid*.), the high court discussed limits on recovery for emotional distress for negligence actions. It stated: "Unlike an award of damages for intentionally caused emotional distress which is punitive, the award for NIED [negligent infliction of emotion distress] simply reflects society's belief that a negligent actor bears some responsibility for the effect of his conduct on persons other than those who suffer physical injury. In identifying those persons and the circumstances in which the defendant will be held to redress the injury, it is appropriate to restrict recovery to those persons who will suffer an emotional impact beyond the impact that can be anticipated whenever one learns that a relative is injured, or dies, or the emotion felt by a 'disinterested' witness." (*Id*. at p. 667.)

The instant case, however, is not a "bystander" case. Rather, it is a "direct victim" case, "in which damages for serious emotional distress are sought as a result of a breach of duty owed the plaintiff that is 'assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two.'" (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1073 (*Burgess*).) The duty here is that imposed by statute on the Coroner's Office "to make a reasonable attempt to locate decedent's family." (*Davila v. County of Los Angeles* (1996) 50 Cal.App.4th 137, 140.) As the high court has held, in "direct victim" cases, "the limits set forth in *Thing*, *supra*, 48 Cal.3d 644, have no direct application. [Citations.] Rather, well-settled principles of negligence are invoked to determine whether all

20

elements of a cause of action, including duty, are present in a given case." (*Burgess*, at p. 1073.) These well-settled principles of negligence include that serious or severe emotional distress may be recovered in negligence actions. (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 930.)

The County also argues that, as a matter of law, Plaintiffs failed to prove serious emotional distress. It notes that "the distress-causing event of Frankie's 'death'" lasted 17 days. Additionally, Plaintiffs produced no evidence they received healthcare, psychological counseling, family counseling, or psychiatric treatment. Nor was there any expert evidence that they would suffer distress in the future. We disagree that there was insufficient evidence to support the jury's finding that Plaintiffs suffered serious emotional distress. As the high court has stated, a plaintiff can recover in a negligence action for """"fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, as well as physical pain."""" (*Burgess*, *supra*, 2 Cal.4th at p. 1085.) Plaintiffs testified to suffering, among other emotions, grief, anxiety and shock upon learning that Frankie had died. Their testimony constituted substantial evidence for the jury's finding of serious emotional distress. Accordingly, the trial court properly denied JNOV on the negligence-based claims.

## II

### NEW TRIAL MOTION

"The determination of a motion for new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears. This is particularly true when the discretion is exercised in favor of awarding a new trial, for this action does not finally dispose of the matter. So long as a reasonable or even fairly debatable justification under the law is shown for

the order granting the new trial, the order will not be set aside." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 (*Jiminez*).)

"The powers of a trial court in ruling on a motion for new trial are plenary. The California Supreme Court has held that the trial court, in ruling on a motion for new trial, has the power 'to disbelieve witnesses, reweigh the evidence, and draw reasonable inferences therefrom contrary to those of the trier of fact' [citation], that the court sits as 'an independent trier of fact' [citation] and that it must 'independently assess[ ] the evidence supporting the verdict' [citation]. The trial judge has 'to be satisfied that the evidence, as a whole, was sufficient to sustain the verdict; if he was not, it was not only the proper exercise of a legal discretion, but his duty, to grant a new trial.' [Citation.]" (*Barrese v. Murray* (2011) 198 Cal.App.4th 494, 503.) Appellate courts have described the trial judge on new trial motions as "a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses." (*Holmes v. Southern Cal. Edison Co.* (1947) 78 Cal.App.2d 43, 51-52.)

Plaintiffs contend the trial court erred in granting a new trial on the negligence-based claims based on failure to prove serious emotional distress. They argue the trial court did not reweigh evidence but applied "incorrect legal determination(s)." As an initial matter, we note the trial court correctly cited the applicable principles for reviewing a new trial motion, and we presume the court followed the applicable law. (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443 ["[A]n appellate court must presume that the decision of the trial court is correct"].) We turn to Plaintiffs' arguments regarding the court's findings on severe emotional distress.

First, they argue the court's finding that "[a]ny emotional injury could not be caused by the discovery that Frankie was alive" is a legal

conclusion that "a wrongful identification of remains could never form the basis of severe emotional distress." We disagree. This is a gross mischaracterization based on a misreading of the court's finding. That finding only limits the causes of severe emotional distress by concluding that discovering Frankie was alive did not cause additional emotional injury. It does not suggest that being informed that Frankie is dead could not cause severe emotional distress.

Plaintiffs' subsequent arguments misapprehend the role of the trial judge as the "thirteenth juror." They argue the court improperly indulged the inference that any emotional distress should have ceased once Frankie was found alive. But this is a factual inference that a factfinder may draw based on the evidence. They argue that "it was for the jury to determine whether, on the evidence, severe emotional distress existed," but the trial judge functions as a juror on new trial motions. They cite cases where a factfinder has found severe emotional distress, but do not provide persuasive reasoning that the facts in this case *compel* a finding of severe emotional distress.  For example, while a reasonable juror could conclude that having a stranger buried in a family gravesite would cause severe emotional distress, nothing compels a factfinder to conclude that fact always would result in severe emotional distress.

We note Plaintiffs did not discuss the trial court's determination that Meikle was not credible about her conversation with Estrada or about the extent of her emotional distress. When discussing damages for serious emotional distress, the court found, based on the trial testimony, both Kerrigan and Meikle were happy about Frankie being alive for a very brief time. They immediately sought an attorney. They also did not receive mental health treatment. These credibility determinations and factual findings

23

support an inference that Plaintiffs did not suffer serious emotional distress or at least serious emotional distress beyond the 17-day period before they learned Frankie was alive. In sum, the trial court's new trial order was sufficient to disclose its reasoning and permit meaningful appellate review. Because the court's reasoning is supported by the record, we are bound to uphold the order granting a new trial on the negligence-based claims. (*Jiminez*, *supra*, 4 Cal.3d at p. 387 ["So long as a reasonable or even fairly debatable justification under the law is shown for the order granting the new trial, the order will not be set aside"].)

Because a new trial on the negligence-based claims necessarily would encompass the issue of damages, Plaintiffs' challenge to the order granting a new trial on damages is moot.

DISPOSITION

The postjudgment order granting JNOV on the intentional misrepresentation claims, and denying JNOV on the negligence-based claims is affirmed. The postjudgment order granting a new trial on the negligence-based claims is affirmed. The parties to bear their own costs on appeal.

DELANEY, J.

WE CONCUR:

O'LEARY, P. J.

GOODING, J.

24